**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Darrin Scott Rick,                                  Case No. 19-cv-2827 (NEB/DTS)

     Petitioner,

                                                  **ORDER &**
v.                                                  **REPORT AND RECOMMENDATION**

Jodi Harpstead,
*Commissioner, Minnesota Department
of Human Services*,

     Respondent.

Petitioner Darrin Rick has been a patient in the Minnesota Sex Offender Program since he was committed as a sexually dangerous person in 2004. In his habeas petition Rick collaterally attacks his civil commitment, arguing that research published after his commitment demonstrates the scientific unreliability of the evidence that caused his commitment. This new evidence, not discoverable at the time of his commitment hearing, has in turn led the two court-appointed experts to recant their hearing testimony and to opine that Rick did not meet the standard for commitment in 2004. He alleges that the state court's substantial reliance on faulty scientific evidence and the recanted expert testimony renders his hearing fundamentally unfair and his commitment a miscarriage of justice. Because no state process exists for Rick to raise this due process claim, he requests an evidentiary hearing here to develop the record.

Hennepin County[1] moves to dismiss Rick's petition on several procedural grounds, including timeliness, exhaustion and procedural default, and because "his petition lacks

---

[1] Rick has properly named as the respondent Jodi Harpstead, the Commissioner of the Minnesota Department of Human Services, because she is the state officer holding Rick in custody. 28 U.S.C. § 2254 Rule 2(a). Hennepin County, however, petitioned for Rick's commitment, so it responds on Harpstead's behalf and defends the state court judgment.

legal merit," Dkt. No. 40 at 2, which this Court construes to mean that it fails to state a claim on which relief can be granted. For the reasons below, the Court recommends that the motion to dismiss be denied and grants Rick's request for an evidentiary hearing.

## FINDINGS OF FACT

Following a bench trial in 2004, a Minnesota court found Rick was a sexually dangerous person and civilly committed him to the Minnesota Sex Offender Program (MSOP). Over the ensuing fifteen years, Rick pursued several avenues for post-commitment relief, including direct appeal, state habeas corpus, and administrative review, none of which succeeded. Then, in 2019, a psychologist evaluated Rick, reviewed his commitment case, and determined that data used to commit Rick was no longer considered scientifically reliable. The psychologist's report was shared with the two court-appointed expert psychologists who had testified at Rick's commitment hearing in support of commitment. These court-appointed experts have now recanted their testimony and opined that Rick in fact did not meet the statutory criteria for commitment in 2004. With no state process to present that new evidence or raise his constitutional claims, Rick filed this petition for habeas relief.

## I.    Background

In 1993, Rick pleaded guilty to four counts of criminal sexual conduct, each charge involving a minor victim. Dkt. No. 41 at 4 ¶¶ 10–13. He was sentenced to a 180-month term of imprisonment, which he served until his release in January 2004. *Id.* While in prison, Rick participated in both sex offender treatment and faith-based therapy programs, though he eventually withdrew from both. *Id.* at 7–8 ¶¶ 19–20. Before Rick's scheduled release from prison, the Minnesota Department of Corrections (MNDOC) assessed Rick's recidivism risk and analyzed the appropriateness of recommending Rick for civil commitment. *Id.* at 2–3 ¶ 3. It declined to recommend Rick for commitment,

instead recommending supervised release with conditions that included that Rick complete sex offender treatment in the community. *Id.* Notwithstanding MNDOC's assessment, Hennepin County initiated civil commitment proceedings against Rick in December 2003 before his scheduled release. *Id.* at 2.

## II.    Rick's Commitment

As part of the commitment process, three psychologists evaluated Rick—either in person or through a records review. During the commitment hearing, the trial court heard testimony from over a dozen witnesses, including the three psychologists, who also submitted written reports. *Id.* at 3. Both court-appointed psychologists, Dr. Roger Sweet and Dr. Thomas Alberg, concluded Rick met Minnesota's statutory definition for a Sexually Dangerous Person (SDP) but not for a Sexual Psychopathic Personality (SPP). *See, e.g.*, *id.* at 11–13. Under Minnesota law, an SDP is one who:

(1)    has engaged in a course of harmful sexual conduct (as statutorily defined)
(2)    has manifested a sexual, personality, or other mental disorder or dysfunction; and
(3)    as a result, is highly[2] likely to engage in acts of harmful sexual conduct (as statutorily defined).

Minn. Stat. § 253B.02, subd. 18c (2004) (current version at Minn. Stat. § 253D.02, subd. 18 (2021)). They also found that less restrictive alternatives to MSOP's high-security facilities would sufficiently treat Rick. Dkt. No. 41 at 12–13.

Hennepin County's retained expert, psychologist Dr. James Alsdurf, agreed that Rick qualified as an SDP and not as an SPP. *Id.* at 14. Dr. Alsdurf disagreed with the

---

[2] Though the statutory language requires only that the person be "***likely*** to engage in acts of harmful sexual conduct," the Minnesota Supreme Court has interpreted the statute to mean that the individual must be "highly likely" to engage in such conduct. *In re Linehan* (*Linehan III*), 557 N.W.2d 171, 180 (Minn. 1996), *vacated and remanded*, 522 U.S. 1011 (1997), *aff'd as modified*, 594 N.W.2d 867m 874 (Minn. 1999).

court-appointed psychologists, asserting the only appropriate treatment for Rick was at MSOP. *Id.*

In determining that Rick met the SDP criteria, each expert used psychological actuarial assessments to evaluate whether Rick was highly likely to engage in future acts of harmful sexual conduct. Those assessments evaluated certain criteria to calculate a score corresponding to a low, medium, or high risk of recidivism, which in turn correlated with a statistical recidivism risk percentage over a specific period. To illustrate, one psychologist determined Rick scored a "3" on the Static-99 test. That result signified that Rick was a low to medium risk, which predicted that Rick had a 12% chance of recidivism in five years, 14% in ten years, and 19% in fifteen years. Dkt. No. 43 at 90–91. Beyond the actuarial assessments, the experts also considered factors specific to Rick, such as his treatment history, historical victim profile, his sexual history, and his diagnoses. Even though Rick's scores generally put Rick in the low to moderate risk category, considering his risk along with these other factors[3] convinced the court-appointed experts that Rick met or, in the case of Dr. Alberg, "probably" met, the criteria for commitment as an SDP. *See, e.g.*, Dkt. No. 43-2 at 95.

Based on the evidence at the hearing, Judge Kevin Burke found Rick met the criteria for commitment as an SDP. He committed Rick to MSOP but stayed commitment on condition that Rick comply with the terms of his conditional release and successfully complete a designated outpatient sex offender treatment program. Dkt. No. 41 at 15. Hennepin County appealed, and the Minnesota Court of Appeals reversed the stay of

---

[3] The experts' consideration of some of those factors was "double counting" because the actuarial assessments already accounted for those criteria. The Minnesota Supreme Court has cautioned state district courts "to be wary of the potential factor repetition that can result from considering the *Linehan* factors in addition to multiple actuarial assessments that use different approaches based on factors that are the same as or similar to the *Linehan* factors." *In re Ince*, 847 N.W.2d 13, 24 (Minn. 2014).

commitment, both because the County had not agreed to the stay, as required by state statute, and because the record did not establish that Rick had been accepted into the proposed outpatient program. *Id.* at 55–56.

Following the Minnesota Court of Appeals' decision, the trial court held an indeterminate commitment hearing, where it found there was no change in Rick's diagnosis but received more evidence about available less restrictive treatment alternatives. *Id.* at 58. Although the outpatient program the trial court had originally identified (Project Pathfinder) would no longer accept Rick "because of social and political pressure," *id.*, the outpatient sex offender treatment program at the University of Minnesota Program in Human Sexuality agreed to accept him, *id.* at 59–61. Dakota County, however, would not approve of Rick living with his parents in Hastings, Minnesota immediately following his release, and instead required he live in a halfway house for at least ninety days. *Id.* at 62–63. Rick's parents testified that they would be willing to personally fund the costs—even if exceeding $100,000—of Rick's private treatment, housing, GPS monitoring, or other expenses if the DOC would not provide that funding. Dkt. No. 41 at 10 ¶ 27; Dkt. No. 43 at 174–77, 180–81. Unfortunately, MNDOC had approved for Rick to stay only sixty days at the halfway house, and the halfway house would not accept Rick as a "private pay" client for the thirty days not approved by MNDOC. *Id.* at 63–64. The trial court therefore concluded Rick had not shown that the proposed less-restrictive plan was "presently available" and committed him to MSOP indefinitely. *Id.* at 65. As Rick's habeas counsel has aptly observed, Rick "came within an eyelash of being treated in the community." Dkt. No. 6 at 22.

Rick appealed his indeterminate commitment, arguing that there was insufficient evidence to establish he was highly likely to reoffend and therefore did not meet the commitment criteria, and that he had proven by clear and convincing evidence that a less

restrictive alternative program was available. Dkt. No. 41 at 67–92. The Minnesota Court of Appeals rejected both arguments and affirmed the commitment order. *Id.* at 127–29. The Minnesota Supreme Court denied further review. *Id.* at 130.

## III.    The New Evidence

In 2019, Rick's counsel consulted Amy Phenix, Ph.D., a forensic psychologist. Dkt. No. 4 ¶ 4; Dkt. No. 5 Ex. 8. After reviewing records and interviewing Rick, Dr. Phenix issued a forensic report in April 2019. Dkt. No. 5 Ex. 7. In her report Dr. Phenix found that while the actuarial risk assessment tools used at the time of Rick's commitment "were appropriate for that period in time," subsequent research has shown those tests vastly overestimated the general probability of sex offender recidivism. The studies from which the actuarial assessments were taken consisted of samples of incarcerated sex offenders released from MNDOC custody in 1988, 1990, and 1992. *Id.* at 79. At that time, offenders were released with no structured, external controls on sexual behavior and no supports for pro-social behavior. These studies predicted a base rate recidivism of 23%. Low-risk offenders had a six-year recidivism rate of 12% and moderate risk offenders had a six-year recidivism rate of 25%.

In 2012, eight years after Rick's commitment, new research on recidivism rates demonstrated that Minnesota sex offenders released from MNDOC between 2003 and 2006 (the period during which Rick was released from MNDOC custody) were in fact much less likely to reoffend than had been previously thought: the recidivism rates for moderate-risk offenders was 6%, rather than 25%; for low-risk offenders it was 3%, not 12%. Other research published since Rick's commitment demonstrated that the failure to complete sex offender treatment (especially if someone withdrew from the program as Rick did, rather than being kicked out of the program) did not increase the risk of recidivism, as the prior evaluators had assumed. *Id.* at 81–83, 87. Using current

research, Dr. Phenix assessed Rick's current risk of sexual recidivism, estimating his likelihood of re-offense within five years to be between 5.6% and 6.8%. *Id.* at 90–94, 101.

Both court-appointed experts from Rick's commitment reviewed Dr. Phenix's report and have recanted their hearing testimony. Dr. Alberg states he now believes Rick's commitment as an SDP "was inappropriate in 2004" and that Rick "would not meet the criteria to be committed in 2019." Dkt. No. 5 Ex. 4, at 2. Similarly, Dr. Sweet asserts that he "could have avoided the frustrating and exasperating process of arguing for a Stay of Commitment, because [he] would have opined that Mr. Rick did not meet the statutory criteria necessary for commitment as a Sexually Dangerous Person [in 2004]." *Id.* Ex. 6, at 4.

Rick argues that this new evidence discredits the reliability of the actuarial assessments and clinical assumptions about sexual recidivism that the experts used at his commitment hearing. He argues that because the trial court relied so heavily on the debunked scientific evidence and the recanted expert testimony, his commitment is a fundamental miscarriage of justice and his hearing violated his right to due process under the Fourteenth Amendment.

## CONCLUSIONS OF LAW

I.    **Legal Standards**

   **A. Habeas relief**

A federal court may issue a writ of habeas corpus only if the petitioner establishes they are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A person in custody pursuant to a state court's civil commitment order may challenge the legality of his or her custody through a petition for a writ of habeas corpus. *Duncan v. Walker*, 533 U.S. 167, 176 (2001) (stating that a state court order of civil commitment satisfies § 2254's "in custody" requirement). Subject to limited

exceptions, however, federal courts may not grant habeas relief unless petitioners first exhaust their state court remedies, 28 U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), and bring their claim within the one-year statute of limitations, 28 U.S.C. § 2244(d)(1). These procedural limitations, however, are not without exception. Depending on the basis for the petition, the statute of limitations may not begin to run for some period of time, 28 U.S.C. § 2244(d)(1); *Holland v. Florida*, 560 U.S. 631, 649 (2010), and petitioners need not exhaust their state remedies if no adequate corrective process exists, 28 U.S.C. § 2254(b)(1)(B); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 841 (1999) (explaining that the exhaustion doctrine "turns on an inquiry into what procedures are 'available' under state law.").

### B. Standard of review on motions to dismiss a petition for a writ of habeas corpus

Section 2254 prescribes the standard that governs review of Rick's habeas claim. Federal courts can entertain petitions alleging only that a petitioner's custody violates "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Court must presume correct any state court factual determinations, though the petitioner can rebut that presumption of correctness by clear and convincing evidence. *Id.* § 2254(e)(1). When a state court has not adjudicated a claim on the merits, federal courts review that claim *de novo* because the lack of a state court factual finding creates nothing to which a presumption of correctness may attach. *Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Guidry v. Dretke*, 397 F.3d 306, 326–27 (5th Cir. 2005), *cert. denied*, 547 U.S. 1035 (2006).

Thus, this Court presumes correct the state court's factual findings from Rick's commitment hearing, which Rick may only rebut by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Because the case is before the Court on the County's motion to

dismiss, the Court views unadjudicated facts about Rick's claim under the Rule 12(b)(6) standard, in the light most favorable to Rick. *Juniper v. Zook*, 876 F.3d 551, 564 (4th Cir. 2017).

## II.    Timeliness

Hennepin County argues Rick's petition is untimely and therefore must be dismissed. For the reasons outlined below, this Court disagrees.

Under 28 U.S.C. § 2244, a federal habeas petition brought "by a person in custody pursuant to the judgment of a State court" is subject to a one-year statute of limitations. 28 U.S.C. § 2244(d)(1). The one-year limitation period begins to run from the latest of four triggering events:

> **(A)**  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> **(B)**  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> **(C)**  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> **(D)**  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Rick argues that his case falls under subsection (d)(1)(D) and the one-year period runs from the date he could have diligently discovered the new expert evidence, which was in turn based on the new research regarding recidivism rates published several years after his commitment. Dkt. No. 6 at 4. Hennepin County agrees that subsection (d)(1)(D) applies but argues that Rick has failed to meet that subsection by filing his petition within one year from the date on which the factual predicate of his claim could have been

discovered through the exercise of due diligence. Dkt. No. 42 at 8. In evaluating whether a petitioner exercised due diligence, courts should consider "when a duly diligent person in petitioner's circumstances would have discovered" the operative facts. *Anjulo-Lopez v. United States*, 541 F.3d 814, 817–18 (8th Cir. 2008).

The Court's analysis of this issue must begin by determining what is the factual predicate of Rick's due process claim. *McAleese v. Brennan*, 483 F.3d 206, 213 (3d Cir. 2007). In his habeas petition Rick identifies three factual predicates for his claim: (1) that Dr. Alberg, in light of improvement in actuarial testing and more recent research regarding sex offender recidivism, has recanted his testimony at the commitment hearing and now opines that Rick did not meet the standard for commitment in 2004; (2) that Dr. Sweet has similarly recanted his testimony and now opines that, based on the new, scientifically reliable data, Rick did not meet the criteria for commitment in 2004; and (3) that Dr. Phenix has conducted a review of his case and has found that the scientific evidence used to commit Rick has now been shown to be unreliable and that applying reliable scientific principles to Rick's case demonstrates that Rick did not meet the standard for commitment when he was committed. *See* Pet. at 7–9, Dkt. No. 1.

Hennepin County does not contest that these are the predicate facts of Rick's due process claim. Nor does it contest that Rick only discovered those facts in or after April 2019 and that he filed his petition within six months of his discovery. *See* Dkt. No. 42 at 8–11. Rather, Hennepin County argues that, had he exercised due diligence, Rick could have discovered these predicate facts long before April 2019. Rick contends that the factual predicate here is atypical because it is not merely the discovery of a fact or legal theory but is instead a psychological conclusion derived from synthesizing specialized research and psychological data, the understanding of complex psychological assessments and evaluation methods, and the clinical judgment of forensic

psychologists. Dkt. No. 6 at 4–5. Rick "has neither the training nor the means to discover or assess changes and developments" in a specialized area of psychology. *Id.* at 5. Thus, Rick presents the factual predicate as multifactorial and discoverable only by someone with adequate technical knowledge. *Id.* What this indicates, according to Rick, is that the sole means for him to discover the factual predicate was for an expert to divulge it to him, which occurred in April 2019 when Dr. Phenix issued her report and the court-appointed experts subsequently recanted their commitment hearing testimony. *Id.*

Hennepin County disagrees. To begin, it contends that Rick has not presented new evidence because some of the research fundamental to Dr. Phenix's conclusions was available at the time of Rick's commitment hearing, though it concedes that other influential research only became available in 2012. Dkt. No. 42 at 8. It argues Rick's petition is untimely because he could have discovered the new research by 2012 at the latest but did not file his petition until 2019. *Id.* at 8–10. Unlike Rick, who frames the factual predicate as the court-appointed experts' recantation and Dr. Phenix's expert opinion based on new psychological research, statistical data, and revised recidivism assessment tools, Hennepin County argues that the applicable dates are those tied to each piece of data, or to the last piece of data, which was published in 2012. *Id.* at 8–9. Even if the factual predicate—the new evidence—could not have been discovered until the *last* of the research Dr. Phenix relied on was published, Hennepin County argues, that date was 2012, well more than a year before Rick filed his petition.

Hennepin County's argument misperceives the factual predicate of Rick's claim. The factual predicate of Rick's claim is the recantation of the two court-appointed experts and the new opinion of Dr. Phenix, not the research that eventually led to the discovery of this new evidence.

In response, Hennepin County targets Rick's due diligence, arguing that Rick has had access to attorneys and psychologists since 2011 when he sought a provisional discharge from MSOP. Dkt. No. 42 at 9–10. Throughout that time, the County asserts, Rick's "access to an attorney and forensic psychologist of his choice" establish that, with due diligence, Rick should have discovered the research he presents here. *Id.* That argument, however, does not fairly depict Rick's access to an attorney and forensic psychologist. Though Rick had an attorney and psychologist working on his case in the years before this habeas petition, *see* Dkt. No. 41 at 160–62, their efforts were aimed at achieving a provisional discharge from treatment, not at assessing whether he had in fact met the criteria for commitment years earlier. The criteria for each are different. *Compare* Minn. Stat. § 253D.02, subd. 16 (SDP commitment criteria), *and* Minn. Stat. § 253D.07 (same), *with* Minn. Stat. § 253D.30, subd. 1 (discharge criteria), *and* Minn. Stat. § 253D.31 (same).

Under the County's theory, Rick's attorney and psychologist should have recognized the flawed science introduced at his commitment—assuming the psychological community recognized that scientific change during the time Rick pursued a provisional discharge—even though their focus was on Rick's provisional discharge. Because the commitment and discharge criteria are dissimilar, Hennepin County's theory imposes a burden for Rick's attorney and psychologist to have recognized a methodological defect in a settled court proceeding, which Rick had already appealed unsuccessfully, that applied divergent standards and separate law. If anything, Rick's continual interaction with a psychologist demonstrates his diligence, not his lack thereof. "Given the uncontroversial nature of [the recidivism actuarial assessments] at the time of [Rick's] trial, the effect of the [County's argument] is to demand that lawyers go 'looking

for a needle in a haystack,' even when they have 'no reason to doubt there is any needle there.'" *Maryland v. Kulbicki*, 577 U.S. 1, 4–5 (2015).

The factual predicate of Rick's claim is Dr. Phenix's April 2019 report and the recantations by Drs. Alberg and Sweet. Rick promptly filed his petition, in October 2019, well within the one-year limitation period under 28 U.S.C. § 2244(d)(1)(D). The Court further finds that Hennepin County has not demonstrated that Rick failed to exercise due diligence in discovering the predicate facts on which his petition is based. Rick's petition is timely.

## III.    Actual Innocence Gateway

Even if Rick's petition were untimely, this Court may nonetheless reach its merits if Rick's petition falls within the exception for claims of actual innocence or fundamental miscarriages of justice.

In *McQuiggin v. Perkins*, the United States Supreme Court recognized a "miscarriage of justice" or "actual innocence"[4] exception to the one-year statute of limitations for a late filed habeas petition in a criminal case. *McQuiggin v. Perkins*, 569 U.S. 383, 391–99 (2013). "Actual innocence, if proved, serves as a gateway through which a [habeas] petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations." *Id.* at 386. But "tenable actual-innocence gateway pleas are rare" and require new evidence that "persuades the district court that,

---

[4] The "miscarriage of justice" and "actual innocence" exceptions are functionally equivalent. *See Sawyer v. Whitley*, 505 U.S. 333, 333 (1992) ("The miscarriage of justice exception applies where a petitioner is 'actually innocent' of the crime of which he was convicted."); *Schlup v. Delo*, 513 U.S. 298, 321 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence."); *House v. Bell*, 547 U.S. 518, 537 (2006) (using both miscarriage of justice and actual innocence to describe the same exception).

in light of the new evidence, no juror, acting reasonably, would have voted to find [the petitioner] guilty." *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). Though the Supreme Court in *McQuiggin* applied this exception in the context of a criminal conviction, some courts in other circuits have found it also applies to a petitioner alleging there is no basis for his or her civil commitment. *Schmidt v. McCulloch*, 823 F.3d 1135, 1137 (7th Cir. 2016). Thus, assuming the gateway innocence claim may be raised here, Rick must ultimately persuade this Court that, in light of the new evidence, no reasonable *jurist*, acting reasonably, would have *committed him*.

New evidence means evidence that was "not available at trial and could not have been discovered earlier through the exercise of due diligence." *Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005), *as amended*, (June 21, 2005) (quoting *Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001). That new evidence must be "so strong that a court cannot have confidence in the outcome of the trial." *McQuiggin*, 569 U.S. at 401 (quoting *Schlup*, 513 U.S. at 316).

Rick argues that new evidence—Dr. Phenix's opinion and the expert witnesses' recantation—will so undermine the remaining expert testimony presented at his commitment hearing that it will eliminate the basis for the state court's decision to commit him. Dkt. No. 9 at 1–2. Without that testimony, Rick alleges, the remaining evidence from his commitment hearing (the opinion of the Hennepin County expert) is inadequate to support his civil commitment under *Foucha v. Louisiana*, 504 U.S. 71 (1992).

Hennepin County asserts that the fundamental miscarriage of justice exception is inapplicable for two reasons: First, the exception applies to criminal convictions only, not civil commitments. Dkt. No. 42 at 13. Second, Rick's new evidence is not enough to show that it is "more likely than not" that the state court would not have committed Rick. *Id.* at 15–16.

**A.    Whether the gateway innocence exception applies to civil commitments**

Hennepin County first argues that the new evidence Rick presents is irrelevant because the gateway innocence exception does not apply outside the criminal context. It alleges that courts deciding gateway innocence claims after *McQuiggin* have continued to emphasize that the exception is limited to the criminal context only. Hennepin County's argument relies on a semantic construction of *McQuiggin* that ignores its meaning.

*McQuiggin* directed that "[t]he miscarriage of justice exception . . . applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have **convicted** [the petitioner].'" *McQuiggin*, 569 U.S. at 394–95 (quoting *Schlup*, 513 U.S. at 329) (emphasis supplied). Hennepin County argues that the Supreme Court used this language to indicate that the exception is limited to criminal cases only. In cautioning that tenable gateway innocence claims are rare, the Supreme Court stated that a petitioner must "'persuade[] the district court that, in light of the new evidence, **no juror**, acting reasonably, would have voted to find him **guilty beyond a reasonable doubt**.'" *Id.* at 386 (emphasis supplied) (quoting *Schlup*, 513 U.S. at 329). In addition, the Supreme Court emphasized throughout its *McQuiggin* opinion, that the exception applies to only extraordinary claims—that the standard is "narrow," "demanding," and "seldom met." *Id.* at 386, 401. Hennepin County argues that because the Supreme Court described the exception as rare and used language applicable to criminal proceedings only, it must apply only in criminal cases. Dkt. No. 42 at 12–13. Thus, the County asserts, it would be inappropriate to apply *McQuiggin* outside the criminal context.

Applying the gateway innocence exception to the civil commitment context is complex. Neither the Supreme Court nor the Eighth Circuit has offered explicit guidance,

and civil commitment itself is infrequent, let alone claims of "actual innocence" in that context. Few circuits, in fact, have addressed this question. However, for the reasons set forth below, this Court finds that the actual innocence gateway may be raised in habeas proceedings challenging a habeas petitioner's custody as a result of a civil commitment.

First, this district has already expressed an inclination to find the exception applicable to civil commitment matters. In *Beaulieu v. Minnesota*, No. 06-cv-4764, 2007 WL 2915077 (D. Minn. Oct. 4, 2007), this District expressed—*in dictum* and in a footnote—that "[t]he natural extension [of *McQuiggin*] to a civil commitment proceeding would be that the exception is available upon a showing, based on new evidence, that a constitutional violation has probably resulted in Petitioner being classified as an SDP or SPP." *Id.* at *4 n.4.

Similarly, also *in dictum* and also in a footnote, the Sixth Circuit stated that the gateway innocence exception could apply "where the constitutional violation demonstrated by [the petitioner] has resulted in the confinement of one who is actually not mentally ill." *Levine v. Torvik*, 986 F.2d 1506, 1517 n.9 (6th Cir. 1993), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99 (1995). That decision, however, applied the pre-AEDPA standard from *Murray v. Carrier*, 477 U.S. 478, 496 (1986), and pre-dated both *Schlup* and *McQuiggin*.

Only the Seventh Circuit has directly addressed whether the gateway innocence exception applies to civil commitments. Recognizing that the "correct application of the actual innocence exception to civil commitment cases is a difficult one," *Brown v. Watters*, 599 F.3d 602, 610 (7th Cir. 2010), the Court held that the parallels between criminal convictions and civil commitments are "close enough that we can assume that the excuse applies in the civil commitment context," *Schmidt v. McCulloch*, 823 F.3d 1135, 1137 (7th Cir. 2016) (Posner, J.).

Second, though *McQuiggin* and most gateway claims arise from criminal convictions, the Supreme Court's justification for the exception applies with equal force to indeterminant civil commitments. In *McQuiggin*, the Court emphasized that the rule allows courts to ensure "that federal constitutional errors do not result in the incarceration of innocent persons." *McQuiggin*, 569 U.S. at 400 (quoting *Herrera*, 506 U.S. at 404). The likelihood of incarcerating innocent persons arises most often from criminal proceedings, thus explaining why the vast majority of gateway innocence claims—and decisions applying that exception—arise in criminal cases. The Supreme court has unequivocally held that persons in custody as a result of a state's civil commitment process may challenge the constitutionality of their custody through the writ of habeas corpus. *Duncan v. Wacher*, 533 U.S. 167, 176 (2001). In other words, it matters not to the availability of the writ whether the petitioner's custody resulted from a criminal proceeding or a civil commitment. In a similar vein, the justification for the existence of the gateway innocence exception—or its application—is no less compelling if a person's unconstitutional custody resulted from a civil rather than a criminal process. The Supreme Court's rationale for the exception applies with equal force to individuals incarcerated through a civil commitment. This Court sees no reason to find otherwise.

Hennepin County, however, intimates that actual innocence claims may be cabined to not just criminal convictions, but, citing *Schlup*, to only criminal convictions when the defendant was sentenced to death. Dkt. No. 42 at 13–15. It argues that the difference between a criminal conviction with sentence of death and commitment as an SDP is so significant that it necessarily excludes mere civil commitment from the rare category claims to which the gateway innocence exception is confined. *Id.* But that premise is fundamentally flawed in two respects. First, the language in *McQuiggin* that Hennepin County draws on—that the exception is "narrow," "demanding," "seldom met,"

and that tenable claims are "rare"—refers to the standard of proof required to establish such a claim, not that an otherwise valid claim may only be raised by those facing a sentence of death. Second, this false premise also ignores a fundamental distinction between the facts of *Schlup* and those of *McQuiggin*: though the petitioner in *Schlup* was facing a sentence of death, the petitioner in *McQuiggin* faced a life term of imprisonment. Compare *Schlup*, 513 U.S. at 305, *with McQuiggin*, 569 U.S. at 388. It can hardly be ignored that commitment to MSOP can result in "indefinite and lifetime detention." *Karsjens v. Jesson*, 109 F. Supp. 3d 1139, 1147, 1172–74 (D. Minn. 2015). Such a significant deprivation of liberty, whether it results from a criminal or a civil proceeding, is sufficient to allow a valid actual innocence gateway claim to be raised.

Rick may pursue his actual innocence claim here.

## B.    Sufficiency of Rick's new evidence

Hennepin County asserts that even if the gateway innocence exception is applied to civil commitments, the new evidence Rick presents is not enough to tip the scales in his favor and show that it is "more likely than not" that the state court would have ruled differently. This Court disagrees. To have committed Rick as an SDP required a showing by clear and convincing evidence that some psychological disorder made him highly likely to recidivate. The heart of any commitment hearing is the expert testimony from licensed psychologists as to whether the person meets the statutory definition for commitment, particularly whether they are highly likely to reoffend. *See* Minn. Stat. § 253D.02, subd. 18; *In re Linehan* (*Linehan III*), 557 N.W.2d 171 (Minn. 1996).

At Rick's 2004 hearing,[5] the court heard testimony from twelve witnesses, six of whose testimony did not bear on the issue whether Rick met the statutory criteria for

---

[5] Rick had two commitment hearings, one in 2004 and one in 2006, after his case was remanded to the trial court by the Minnesota Court of Appeals. The 2006 hearing

commitment.[6] Of the other six witnesses, three did not testify on the issue whether Rick met the statutory definition for commitment, though arguably their testimony bore on that issue. Brian Heinsohn was a DOC therapist who oversaw the sex offender treatment program at the Minnesota Correctional Facility in Lino Lakes, where Rick was incarcerated. Dkt. No. 43 at 45–45. Heinsohn testified regarding Rick's group participation and treatment progress during the sixteen months that Rick voluntarily participated in that program. *Id.* at 45–70. He described Rick as reserved in group, but genuine in his desire to receive treatment. Rick complied with all of the group's testing requirements. *Id.* Heinsohn also worked with Rick individually on combating defense mechanisms, allowing himself to be vulnerable during group therapy and providing constructive feedback to other group members. *Id.* The trial court's order of commitment references the fact that Heinsohn testified but does not reference the testimony itself nor give it any apparent weight in the court's decision to commit Rick.

The court heard testimony from another DOC therapist, Dr. Jane Mathews, who did not provide Rick sex offender treatment, but rather counseling for anxiety. Dr. Mathews reported that in 1993, eleven years before his release from prison, Rick did not comprehend the impact of his offenses. This lack of insight, though the court found it startling, has marginal relevance to whether Rick met the standard for commitment eleven

---

concerned only whether Rick would be confined to a high-security in-patient facility (*e.g.* Moose Lake) or to a less restrictive treatment alternative. The court did not reexamine at the 2006 hearing its prior finding that Rick met the statutory criteria for commitment. Therefore, the 2004 hearing is the relevant hearing to examine.

[6] Kathleen Jordan and Ron Johnson, Rick's mother and step-father, testified to the conditions and restrictions under which Rick would live in their home should there be no commitment or should he be treated in a less restrictive environment than Moose Lake. Two witnesses testified regarding Dakota County's release supervision and electronic monitoring, again, in the event Rick were not committed to Moose Lake. The court also heard from Steven Sanford, a former inmate who met Rick in prison, and Harry Mueller, Rick's pastor. Neither of these witnesses testified on the issue whether Rick met the criteria for commitment.

years later. Dr. Mathews did testify that Rick could be appropriately treated in the community in a program known as "Transition Place."

The Court also heard testimony from psychologist Dr. Penny Zwecker, the MNDOC Civil Commitment Review Coordinator to whose testimony the trial court gave great weight. Dr. Zwecker testified that she reviewed Rick's file and treatment notes and conducted an in-person clinical interview with Rick before his release from prison. That clinical interview left Dr. Zwecker with a positive view of Rick—she recalled that he was well spoken, polite, and detailed his sex offense history. Based on her assessment, Dr. Zwecker concluded that Rick would "not be the type of sex offender who would be targeting strangers, who would be predatory in nature, stalking people, trying to surprise a person and sexually offend against them" and should not be referred for commitment. The DOC central office committee concurred in Dr. Zwecker's recommendation. At the commitment proceedings, Hennepin County informed Dr. Zwecker of facts she was unaware of when she made her recommendation to not commit Rick, including information about his treatment progress and victim-specific offense history. Notwithstanding this additional information and the then-current "political climate . . . concerning commitment," Dr. Zwecker testified that Rick did not meet the criteria for commitment. Dkt. No. 43-2 at 18–19.

In short, the testimony of Mr. Heinsohn, Dr. Mathews, and Dr. Zwecker, taken together had little direct bearing on the question whether Rick met the statutory criteria for commitment, but the testimony that most directly bore on that issue favored Rick.

This leaves the testimony of the three psychologists, Drs. Alsdurf, Alberg, and Sweet, all of whom opined that Rick met the statutory criteria for commitment as an SDP. Two of those three, Drs. Alberg and Sweet, have now recanted their opinions and have

opined, based on the newer research on sex offender recidivism and the impact of treatment drop-out on recidivism, that Rick did not meet the criteria for commitment in 2004.

This new evidence is powerful. Often the most important evidence in any sex offender commitment hearing is the opinion testimony of such experts. *See In re Ince*, 847 N.W.2d 13, 18 (Minn. 2014); *see also In re Hill*, No. A05-2438, 2006 WL 1390587, at *2 (Minn. Ct. App. May 23, 2006) ("[E]xpert evaluation and testimony is clearly important in the commitment process . . . ."). Had this new evidence been before the court in 2004 the court would have heard that the two court-appointed expert witnesses, as well as the MNDOC Civil Commitment Coordinator, believed Rick did not meet the criteria for commitment. The only witness who would have testified that he did was Hennepin County's retained expert, Dr. Alsdurf, who also testified that in his opinion Rick could not be treated outside the in-patient programs at Moose Lake—a finding that the trial court clearly rejected. Given the new evidence, considered in the context of the entire record, this Court cannot agree with Hennepin County that Rick's new evidence is insufficient to establish a plausible gateway innocence claim.[7]

Hennepin County argues that there is other evidence in the record that is fatal to Rick's gateway innocence claim. That is, that Rick cannot, as a matter of law, make out a *prima facie* case that, in light of the new evidence, no reasonable jurist could have found him to be an SDP. Hennepin County discusses this evidence at pages 28–36 of its brief. *See* Dkt. No. 42. Hennepin County's recitation is unpersuasive for several reasons. First, most of the evidence the County highlights concerns Rick's background, the details of his

---

[7] Because this is a motion to dismiss, the precise issue before this Court is whether, taking the factual allegations in the light most favorable to Rick, he has pleaded a plausible gateway innocence claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

offenses, and portions of the testimony and opinions of the court-appointed psychologists. *Id.* But all of that evidence was known to Drs. Sweet and Alberg, who have now recanted their opinions *despite* that evidence. In other words, the evidence Hennepin County relies on is, in the opinion of two of the three psychologists, insufficient to support a finding that Rick was committable in 2004. Other evidence Hennepin County cites concerns testimony from the 2006 hearing that did not address the issue whether Rick met the criteria for commitment as an SDP.

The fundamental problem in Hennepin County's argument is its misperception of the nature of the new evidence. The County focuses its attention solely on the new research and asks the question whether the new research on risk assessment is enough to overwhelm the rest of the evidence. But Hennepin County's argument that it is not sufficient fails to appreciate that in the opinion of the court-appointed experts it is. The "new evidence" is not just the new research untethered to any other evidence. The new evidence is the recantation of the court-appointed experts' testimony. These experts could have agreed with Hennepin County that the new research was insufficient to overcome the other evidence, but they did not.

Another flaw in Hennepin County's argument is its failure to appreciate the procedural posture of the motion it has brought. Hennepin County moved to dismiss Rick's petition. In that posture, on these facts, the issue is whether, giving Rick the benefit of the doubt, he has stated a plausible gateway innocence claim. He has.

Because Rick's claim is not untimely this Court need not determine whether the actual innocence gateway permits Rick to bring his petition. But if it were untimely, this Court finds that Rick has presented enough evidence to warrant an evidentiary hearing to determine whether he has satisfied the elements of a gateway innocence claim.

## IV.    Exhaustion and Procedural Default

Hennepin County argues the Court should dismiss Rick's petition because he has

failed to exhaust his state remedies, which are now procedurally barred. The parties have

already briefed the exhaustion issue and the Court already found that Rick did not exhaust

state remedies only because none exist:

> Rick has not exhausted Ground One, but only because there is no process
> for him to do so. Harpstead acknowledges "Rick could not present to the
> [judicial appeal panel] the precise claim he makes in Ground One" because
> both the panel and the Minnesota Court of Appeals have held the panel's
> jurisdiction does not include challenges to the original commitment. Mem.
> Resp't (Hennepin Cty) 38, Dkt. No. 15 (citing *In re Benson*, 2003
> WL 139397, at *3 (Minn. Ct. App. Jan. 21, 2003)). Yet, the Minnesota
> Supreme Court has held the judicial appeal panel process to be "the
> exclusive remedy for patients committed as SDPs and SPP seeking a
> transfer or discharge[,]" so they cannot seek to vacate the commitment
> order under Minnesota Rule of Civil Procedure 60.02. *In re Lonergan*, 811
> N.W.2d 635, 642 (Minn. 2012); *see also In re Hand*, 878 N.W.2d 503, 507
> (Minn. Ct. App. 2016). Without a state process to exhaust his specific claim,
> Rick may properly bring it to federal court. 28 U.S.C. § 2254(b)(1)(B)(i); *see
> also Dixon v. Dormire*, 263 F.3d 774, 777 (8th Cir. 2001) (explaining "the
> exhaustion doctrine turns on an inquiry into what procedures are 'available'
> under state law.") (internal quotations omitted).

R&R at 8–9, Dkt. No. 35, Order accepting *report and recommendation*, Dkt. No. 37.

Because the Court has resolved this issue, it is binding on the parties and the Court as

the law of the case. *Arizona v. California*, 460 U.S. 605, 618 (1983), *decision

supplemented*, 466 U.S. 144 (1984) (explaining that the law-of-the-case doctrine

commands that when a court has ruled, its decision "should continue to govern the same

issues in subsequent stages in the same case").

A brief review of the issue, however, is appropriate. Despite recognizing that "Rick

[can]not present to the [Commitment Appeal Panel] the precise claim he makes,"

Hennepin County has argued that Rick should exhaust his state remedies because the

available state administrative procedures "may grant Rick the relief that federal habeas

would grant him." Dkt. No. 42 at 37–38. The procedure the County points to, however, is

that Rick may petition for discharge from MSOP, not that he may present the due process claim he brings here. *Id.* at 38 & n.15. The state discharge remedy requires that Rick *no longer* meet the criteria for continued commitment, a showing he must make by clear and convincing evidence. In contrast, in this petition, Rick seeks to demonstrate that his original commitment hearing was fundamentally unfair and violated his due process rights, a showing he must make by a preponderance of the evidence. While the state procedure—if successful—will result in his release from MSOP, that release may be provisional and will not invalidate his prior commitment. In contrast, this petition, if successful, will remove his prior commitment entirely.[8] In short, Rick's habeas claim is distinct from the state discharge claim and cannot be exhausted through that process. *Cf., e.g.*, *Simpson v. Norris*, 490 F.3d 1029, 1035 (2007) (Federal 8th Amendment claim under *Adkins* is separate and distinct from "similar" state statutory mental-retardation claim).

Moreover, even if Rick had failed to exhaust available state court remedies, which would now be procedurally defaulted, the same actual innocence exception would apply to excuse any such defaulted claims. Regardless, the exhaustion issue has been decided and is binding law of the case.

## V.    Rick's Due Process Claim

Though Hennepin County's arguments focus primarily on whether various procedural requirements bar Rick's petition, it also asserts Rick's Petition lacks legal merit. Rick's due process claim alleges the trial court's substantial reliance on false evidence rendered his commitment hearing fundamentally unfair.

---

[8] Whether, if that is the outcome, Hennepin County chooses to re-initiate commitment proceedings or negotiate a release-with-conditions resolution is not for this Court to say.

He argues that when a judgment—as here—is based so significantly on flawed scientific testimony that it undermines the fundamental fairness of the proceedings a due process violation is stated. Though state evidentiary determinations rarely raise a federal question reviewable in a habeas petition, *Scott v. Jones*, 915 F.2d 1188, 1190–91 (8th Cir. 1990), federal courts "may . . . review evidentiary rulings of state courts [if] they implicate federal constitutional rights," *Evans v. Luebbers*, 371 F.3d 438, 443 (8th Cir. 2004). Indeed, "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—*not* to correct errors of fact." *Herrera*, 506 U.S. at 400 (emphasis added).

Alleging that evidence admitted at trial was so faulty that it "'fatally infected the proceedings and rendered [the] entire trial fundamentally unfair'" implicates a due process violation subject to federal court review. *Cf. Anderson v. Goeke*, 44 F.3d 675, 679 (8th Cir. 1995). The Eighth Circuit has never expressly determined whether the introduction of flawed expert testimony may rise to the level of a constitutional violation, but has assumed without deciding that new scientific information, which reveals that a conviction results from "false testimony," may amount to a due process violation. *Rhodes v. Smith*, 950 F.3d 1032, 1036 n.2 (8th Cir. 2020). Introducing false evidence at trial violates due process, *see Winslow v. Smith*, 696 F.3d 716, 735 (8th Cir. 2012), especially if the government knows evidence is false, because the trial then could not "in any sense be termed fair," *Napue v. Illinois*, 360 U.S. 264, 269, 270 (1959). But even if the government is unaware that the evidence it presents is false, that ignorance does not mean that the trial was fair; it simply means the government is not culpable for the resulting injustice. *See United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (new trial is warranted despite government's lack of awareness if the false testimony was material and the court has a firm belief that but for that evidence, the trial would have had a different outcome).

25

Rick's argument relies primarily on the Third Circuit's decision in *Lee v. Glunt*, 667 F.3d 397 (3d Cir. 2012), which recognized a similar due process claim in analogous circumstances. Lee was convicted of murder and arson in 1990, but that conviction relied on fire science expert testimony that was later discredited. *Lee*, 667 F.3d at 400, 403–04. Twenty-two years after his conviction, Lee sought habeas relief, arguing that admitting the testimony undermined the fundamental fairness of the entire trial because the evidence was critical to his conviction. *Id.* at 407. Holding that Lee was entitled to discovery, the Third Circuit observed that:

> Lee also argues that he is entitled to federal habeas relief because he is actually innocent. As explained hereafter, Lee's allegations, if proven, would be sufficient to establish a due process violation. Therefore, we need not decide whether Lee's allegations meet the "extraordinarily high" threshold for granting federal habeas relief based on a freestanding claim of actual innocence.

*Id.* at 403 n.5 (citing *Herrera*, 506 U.S. at 390). The Third Circuit then clarified the standard for Lee to succeed on his constitutional claim:

> To succeed, Lee must show that the admission of the fire expert testimony "undermined the fundamental fairness of the entire trial" because "the probative value of [the fire expert] evidence, though relevant, is generally outweighed by the prejudice to the accused from its admission."
>
> . . . .
>
> If Lee's expert's independent analysis of the fire scene evidence—applying principles from new developments in fire science—shows that the fire expert testimony at Lee's trial was fundamentally unreliable, then Lee will be entitled to federal habeas relief on his due process claim.

*Id.* at 403, 407–08 (alteration in original) (citations omitted).

On remand, the district court granted Lee habeas relief, finding that "the admission of the fire expert testimony undermined the fundamental fairness of the entire trial" because the "verdict . . . rest[ed] almost entirely upon scientific pillars which have now eroded." *Lee v. Tennis*, No. 4:08-cv-1927, 2014 WL 3894306, at *16 (M.D. Pa. June 13,

2014), *report and recommendation adopted*, 2014 WL 3900230 (M.D. Pa. Aug. 8, 2014). The Third Circuit again affirmed, holding that Lee's conviction was "based primarily on scientific evidence that . . . [was] discredited by subsequent scientific developments." *Lee v. Houtzdale SCI*, 798 F.3d 153, 161 (3d Cir. 2015).

Other Circuits have also recognized a cognizable constitutional claim for habeas relief based on changed science. In *Gimenez v. Ochoa*, the Ninth Circuit "join[ed] the Third Circuit in recognizing that habeas petitioners can allege a constitutional violation from the introduction of flawed expert testimony at trial if they show that the introduction of evidence 'undermined the fundamental fairness of the entire trial.'" *Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016) (citing *Lee*, 798 F.3d at 162). This type of claim, the Ninth Circuit noted, "is not a 'freestanding innocence claim,' but a due process claim" because the flawed evidence "'infect[s the] entire trial with error of constitutional dimensions.'" *Id.* at 1144 (quoting *Murray v. Carrier*, 477 U.S. 478, 494 (1986)).[9]

The Third and Ninth Circuits' holdings in *Lee* and *Gimenez* align with the Eighth Circuit's standard for evidence-based due process violations. To establish a due process violation, Rick must show that the admission of false expert evidence introduced at his commitment hearing—even if that falsity surfaces because of changed science years after the hearing and was unknown when introduced—undermined the fundamental fairness of his entire commitment hearing because the probative value of the evidence is greatly outweighed by the prejudice from its admission. *Lee*, 667 F.3d at 403.

Hennepin County argues that it is unclear under Eighth Circuit precedent that Rick's claim supports a constitutional violation. It asserts that federal courts presented

---

[9] The Ninth Circuit denied Gimenez habeas relief, but only because his petition was successive and he could not meet the clear and convincing evidence standard for successive petitions under 28 U.S.C. § 2244(b)(2)(B)(ii). *Gimenez*, 821 F.3d at 1145.

with claims for post-conviction relief based on changed or "shifted" science in other contexts—such as shaken baby syndrome or arson science—have been largely unpersuaded that the emergence of new scientific theories or the repudiation of previously accepted theories so substantially undermines confidence in the initial trial that a new trial is warranted. *See, e.g.*, *Cavazos v. Smith*, 565 U.S. 1 (2011) (reversing grant of habeas relief for new evidence raised as sufficiency of the evidence claim).

While it is true that courts considering collateral attacks based on changed science have hesitated to grant post-conviction relief, those cases have had other evidence in the record that substantially supported the conviction. The new science undermined only one discrete piece of the evidence supporting conviction. As a result, the change was not enough to undermine the fairness of the trial or the reliability of the conviction. Rick's commitment hearing, by contrast, relied almost exclusively on the expert evidence to show that he met the elements for commitment. Because expert psychological testimony is necessary to prove the statutory elements for commitment, the changed science has a more profound effect on the fundamental fairness and reliability of Rick's hearing.

For these reasons the Court finds that Rick has stated a sufficiently plausible due process claim to survive the County's motion to dismiss.

## VI.    Evidentiary Hearing

Rick requests an evidentiary hearing to develop the record. Dkt. No. 6 at 7. He alleges the testimony of the experts who testified at his commitment hearing and now recant will establish by clear and convincing evidence that no reasonable factfinder would have found that Rick met the criteria to be committed as an SDP. *Id.* at 7–8.

Section 2254 limits when a federal court can hold an evidentiary hearing for habeas petitions brought under that statute:

> **(2)** If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court *shall not hold an evidentiary hearing* on the claim unless the applicant shows that—
>
>> **(A)** the claim relies on—
>>
>>> **(i)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>>
>>> **(ii)** a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>>
>> **(B)** the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added).

Hennepin County argues that Section 2254(e) precludes an evidentiary hearing for three reasons: (1) Rick was not diligent in discovering the factual predicate of his claim; (2) his new evidence is not enough to show by clear and convincing evidence that no reasonable judge would have committed him; and (3) the legal theory Rick relies on does not apply to civil commitments. Dkt. No. 42 at 41.

Hennepin County's arguments presume that the limitations of Section 2254(e)(2) apply to Rick. That statute prohibits federal courts from granting an evidentiary hearing to petitioners who "*failed* to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2) (emphasis added). If Rick did not *fail* to develop the factual basis of his claim in a state court proceeding, Section 2254(e) does not apply. *Simpson v. Norris*, 490 F.3d 1029, 1035 (8th Cir. 2007) ("By its terms, [Section 2254(e)(2)] applies only if the petitioner 'failed to develop the factual basis of [his] claim in State court,' . . . and the Supreme Court has held that 'a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel,' *Williams v. Taylor*, 529 U.S. 420, 431–32 (2000)."

29

(second alteration in original)); *Newell v. Hanks*, 283 F.3d 827, 838 (7th Cir. 2002) ("We note that § 2254(e)(2), which circumscribes a federal court's ability to hold an evidentiary hearing if the petitioner has 'failed' to develop the factual record in state court, does not apply here because [the petitioner's] claims went undeveloped through no fault of his own."); *see Hurles v. Ryan*, 752 F.3d 768, 791 (9th Cir. 2014) ("A petitioner who has previously sought and been denied an evidentiary hearing has not failed to develop the factual basis of his claim.").

Here, there was no development of the factual basis of Rick's claim in state court proceedings because the lack of an available state court process precluded Rick from doing so. For that reason, Section 2254(e)'s preclusion of an evidentiary hearing does not apply.[10] Given that the Court is not precluded from granting an evidentiary hearing the question is whether it should—or even must—grant one.

Prior to the amendment of the habeas statute, the Supreme Court had enumerated circumstances in which a habeas petitioner was entitled to an evidentiary hearing in federal court. *See Townsend v. Sain*, 372 U.S. 293, 313 (1963). Though the amendment attempted to codify the *Townsend* criteria, it did not completely abrogate *Townsend*. "*Townsend* was not . . . completely superceded by the amendment for the Supreme Court decided when a federal evidentiary hearing is mandatory while the habeas corpus statute, as amended, merely establishes a presumption that the state court judgment is correct unless the applicant establishes one of a number of specific reasons to disregard it." *Guice v. Fortenberry*, 661 F.2d 496, 500 (5th Cir. 1981) (*en banc*). The interplay between *Townsend* and § 2254(d) and the question of whether an evidentiary hearing is *required*

---

[10] Even if Section 2254(e) did apply to rick's petition, it would not preclude an evidentiary hearing because, for reasons outlined above, his petition satisfies the criteria specified in 2254(e)(2)(A)(ii) and (B).

or merely permitted is a complex issue the Court need not address here. Even if an evidentiary hearing is not required the Court may, in its discretion, grant an evidentiary hearing when it is not prohibited. *Schriro v. Lundrigan*, 550 U.S. 465, 468 (2007).

In this case Rick has presented substantial new evidence that undermines the credibility of his commitment hearing. He was unable to present that evidence in state court because there was no state court process to do so, and consequently there is no adequate state court record. Under *Townsend* these three factors would *require* the Court to grant Rick an evidentiary hearing. Whether a hearing is required or merely permissive this Court finds it appropriate to hold one. After carefully considering the facts and circumstances of this case, particularly the impact of the court-appointed experts' recantations and the new expert opinion by Dr. Phenix on the strength of the County's case against Rick, the Court finds that an evidentiary hearing is appropriate and necessary.[11] For these reasons this Court will grant an evidentiary hearing to develop the record.

## CONCLUSION

The County cautions this Court about disturbing the finality of judicial proceedings and the comity afforded state judgments. These considerations are undeniably important. But this Court must "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice." *Schlup*, 513 U.S. at 324.

The Court does not take lightly the "awesome responsibility entrusted to the federal judiciary in its habeas jurisdiction." *Stouffer v. Reynolds*, 168 F.3d 1155, 1173 (10th Cir.

---

[11] The Court will hold an evidentiary hearing for Rick to present evidence on the merits of his petition. If the District Court, however, were to determine that Rick's claim is neither timely nor exhausted, this Court will hold an evidentiary hearing to determine whether Rick has satisfied the elements of a gateway actual innocence claim to overcome those procedural bars.

1999). Rick's petition is not about whether the state court that committed him reached the proper decision. Rather, it concerns whether the evidence the state court relied on so tainted the commitment process that it violated Rick's right to due process. The right to a fair trial is "the most fundamental of all freedoms."[12] When "experts' claims about their field, the authority of their methodologies, and their own abilities have dramatically outstripped what has actually been established by persuasive research and careful study,"[13] and the state closes its doors to hear such a claim, habeas corpus must allow Rick to ensure that his commitment rests on a reliable foundation.

## ORDER

For these reasons, IT IS HEREBY ORDERED:

1.    Petitioner Darrin Scott Rick's request for an evidentiary hearing is **GRANTED**.

2.    Parties shall appear for a status conference on Tuesday, August 24 at 3:00 p.m. to discuss the timing and scope of evidentiary hearing.

## RECOMMENDATION

This Court RECOMMENDS that Respondent Jodi Harpstead's Motion to Dismiss [Dkt. No. 40] be **DENIED**.


Dated: August 13, 2021                     __s/David T. Schultz____
                                           DAVID T. SCHULTZ
                                           U.S. Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

---

[12] Estes v. Texas, 381 U.S. 532, 540 (1965).

[13] Jennifer L. Mnookin, *The Courts, the NAS, and the Future of Forensic Science*, 75 BROOK. L. REV. 1209, 1209–10 (2010).

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to the magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).