# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

DARRIN SCOTT RICK,                                    Case No. 19-CV-2827 (NEB/DTS)

          Petitioner,

v.                                                    ORDER ON REPORT AND
                                                      RECOMMENDATION

JODI HARPSTEAD,

          Respondent.

A Minnesota court committed Petitioner Darrin Scott Rick as a sexually dangerous person in 2004. He has been a patient of the Minnesota Sex Offender Program ("MSOP") ever since. In 2019, Rick petitioned for writ of habeas corpus under 28 U.S.C. Section 2254, seeking his release from custody based on newly discovered evidence. Hennepin County[1] moved to dismiss his petition. In a Report and Recommendation, United States Magistrate Judge David T. Schultz recommended that Hennepin County's motion to dismiss be denied. (ECF No. 53 ("R&R").) Hennepin County objects to the R&R. (ECF No. 56 ("Obj.").) For the reasons below, the Court sustains in part and overrules in part Hennepin County's objection, accepts the R&R as modified below, and denies the motion to dismiss.

---

[1] The named Respondent is Jodi Harpstead, the Commissioner of the Minnesota Department of Human Services, and the officer holding Rick in state custody. Hennepin County petitioned for Rick's commitment, so responds on Harpstead's behalf in defense of the commitment order. (R&R at 1 n.1.)

## BACKGROUND

The R&R details the facts and procedural history of the case, (R&R at 2–7), which are undisputed. The Court briefly lays out the facts necessary to understand the petition's context.[2]

*Criminal conviction.* Rick pled guilty to four counts of criminal sexual conduct involving minors in 1993 and served a 180-month prison sentence. (*Id.* at 2.) While in prison, Rick participated in and eventually withdrew from sex offender treatment. (*Id.*) After the Minnesota Department of Corrections ("DOC") declined to recommend Rick for commitment, Hennepin County began civil commitment proceedings separately. (*Id.* at 3.)

*2004 commitment hearing.* During Rick's civil commitment hearing, court-appointed expert psychologists Thomas L. Alberg, Ph.D. and Roger C. Sweet, Ph.D. testified that Rick met Minnesota's statutory definition for a sexually dangerous person ("SDP").[3] (R&R at 3.) But they also concluded that the MSOP program was not necessary

---

[2] In so doing, the Court cites the R&R and incorporates the citations it contains.

[3] Under Minnesota law, "SDP" is a person who:
    (1) has engaged in a course of harmful sexual conduct as [statutorily defined];
    (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and
    (3) as a result, is [highly] likely to engage in acts of harmful sexual conduct as [statutorily defined].
Minn. Stat. § 253B.02, subdiv. 18c (2004) (now codified at Minn. Stat. § 253D.02, subdiv. 16(a) (2020)); *In re Linehan ("Linehan III")*, 557 N.W.2d 171, 180 (Minn. 1996)

to Rick's treatment; in their opinions, less restrictive alternatives would suffice. (*Id.*) Hennepin County's retained expert, psychologist Dr. James Alsdurf, Ph.D. disagreed, concluding that the only appropriate treatment for Rick was at the MSOP. (*Id.* at 3–4.) Based on this and other evidence, the trial court found that Rick's "moderate risk of recidivism combined with not completing sex offender treatment . . . proved by clear and convincing evidence that there is a likelihood of [Rick] reoffending." (ECF No. 5 ("Heisler Aff.") Ex. 1 ("2004 Order") at 6–7, 11, 17.) The trial court then determined that Rick met the criteria for commitment to the MSOP. (*Id.* at 14.) But the court stayed Rick's commitment so long as Rick complied with certain conditions, including completing an outpatient sex offender treatment program. (*Id.*) Hennepin County appealed, and the Minnesota Court of Appeals reversed the stay, both because Hennepin County had not agreed to the stay as required by law, and because the outpatient treatment program had not accepted Rick. (R&R at 4–5.)

*2006 commitment hearing.* On remand, the trial court held a hearing at which it considered less restrictive treatment alternatives for Rick. (R&R at 5.) The evidence showed that an outpatient treatment program had accepted Rick, but Dakota County (the county in which he planned to live) required Rick to live in a halfway house for 90 days. (*Id.*) The DOC had approved Rick for only a 60-day stay in a halfway house, and the

---

(holding that the statute requires a person to be "highly likely" to engage in acts of harmful sexual conduct), *vacated and remanded*, 522 U.S. 1011 (1997), *aff'd as modified*, 549 N.W.2d 867 (Minn. 1999); *In re Ince*, 847 N.W.2d 13, 20-22 (Minn. 2014) (same).

halfway house refused to accept Rick as a "private pay" client for the other 30 days. (*Id.*) Because the DOC had not approved funding for the full 90 days, the court found that Rick had not shown that the less restrictive plan was "presently available" and committed him to the MSOP indefinitely. (*Id.*) Rick sought post-commitment relief, but did not succeed. (*Id.* at 5–6.) As aptly noted by Rick's counsel and the R&R, Rick "came within an eyelash of being treated in the community" rather than committed to the MSOP, only because of the 30-day gap in funding. (*Id.* at 5; ECF No. 6 at 22.)

*New evidence.* An actuarial risk assessment tool used for Rick's commitment in 2004 predicted that low-risk offenders had a six-year recidivism rate of 12% and moderate-risk offenders had a six-year recidivism rate of 25%. (Heisler Aff. Ex. 7 at 4.) In 2012, research on Minnesota sex offenders released from the DOC between 2003 and 2006 concluded that the recidivism rate for low-risk offenders was 3% (rather than 12%), and that the recidivism rate for moderate-risk offenders was 6% (rather than 25%). (*Id.* at 4 n.2 (citing G. Duwe & P.J. Freske, *Using Logistic Regression Modeling to Predict Sexual Recidivism: The Minnesota Sex Offender Screening Tool-3 (MnSOST-3)*, Sexual Abuse: Journal of Research and Treatment, 24(4), 350–377 (2012) ("2012 Study").) Other new research showed that the failure to complete sex offender treatment did not increase the risk of recidivism. (*Id.* at 7–8 (citing G. Duwe & R. A. Goldman, *The Impact of Prison-Based Treatment on Sex Offender Recidivism: Evidence from Minnesota*, Sexual Abuse: Journal of Research and Treatment, 21(3), 279–307 (2009) ("2009 Study").)

In April 2019, Rick's counsel consulted forensic psychologist Amy Phenix, Ph.D. who evaluated Rick, reviewed his commitment case, and determined that the actuarial data used to commit Rick was no longer scientifically reliable. (R&R at 6–7; Heisler Aff. Ex. 7.) Dr. Phenix concluded that although the actuarial risk assessment tools used at the time of Rick's commitment "were appropriate for that period in time," the subsequent research showed that the tools overestimated the general probability of sex offender recidivism and thus overestimated Rick's risk of recidivism as well. (Heisler Aff. Ex. 7 at 6–7.) Applying this new research, Dr. Phenix concluded that Rick's current risk of recidivism was between 5.6% and 6.8%. (*Id.* at 22, 26.)

Drs. Alberg and Sweet, who had testified in support of Rick's commitment, reviewed Dr. Phenix's report and concluded that, contrary to their testimony at Rick's hearing, Rick did *not* meet the statutory criteria for commitment in 2004.[4] (Heisler Aff. Exs. 4, 6.) Dr. Alberg stated that Rick's commitment as an SDP "was inappropriate in 2004." (Heisler Aff. Ex. 4 at 2.) Similarly, Dr. Sweet stated that "Rick did not meet the statutory criteria necessary for commitment" as an SDP in 2004. (Heisler Aff. Ex. 6 at 4.)

*Habeas petition.* Rick petitioned for habeas relief under Section 2254 in October 2019. (ECF No. 1); *see generally Duncan v. Walker*, 533 U.S. 167, 176 (2001) ("[F]ederal

---

[4] Hennepin County objects to the R&R's characterization of Drs. Alberg's and Sweet's opinions as "recant[ing]" their prior opinions. (Obj. at 1 n.1.) The Court reviews the R&R's findings *de novo*, and as such, makes its own determination about the ramifications of these opinions. Whether "recant" is the correct verb is irrelevant. The key is that both experts concluded that Rick should not have been committed in 2004.

habeas corpus review may be available to challenge the legality of a state court order of civil commitment."). His current petition alleges that his initial commitment is a fundamental miscarriage of justice because the Minnesota court relied on now-discredited risk assessment evidence and expert opinions, thus violating his right to due process under the Fourteenth Amendment. (ECF No. 45 ("2d Am. Pet.") at 3–4.)

*The R&R.* Upon Hennepin County's motion to dismiss the petition, Judge Schultz found that Rick's petition was timely under 28 U.S.C. Section 2244(d)(1)(D), and that even if it were untimely, the petition falls within the actual-innocence gateway exception. (R&R at 9–22.) Judge Schultz also determined that the petition states a sufficiently plausible due process claim to survive the motion to dismiss. (*Id.* at 24–28.) The R&R recommends denying Hennepin County's motion to dismiss the petition.

## ANALYSIS

Hennepin County objects to the R&R on several grounds. First, it argues that Rick's petition was untimely because Rick failed to act with due diligence to discover the new evidence. Second, it contends that the R&R erred in finding that the actual-innocence exception applies to Rick's petition. Third, it maintains that Rick's claim fails on the merits anyway because he has not stated a cognizable due process claim. Finally, Hennepin County contends that the R&R failed to apply the *In re Linehan* line of Minnesota Supreme Court cases.

6

## I.      Standard of Review

The Court reviews the portions of the R&R to which Hennepin County objects *de novo*. 28 U.S.C. § 636(b)(1); D. Minn. LR 72.2(b)(3). In reviewing a habeas petition, federal courts are to presume any state court factual determinations are correct, although the petitioner can rebut that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). If the state court did not adjudicate a claim on the merits, federal courts review the claim *de novo* because there is no state court factual finding to which a presumption of correctness may attach. *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's [constitutional] claim *de novo*."). The state court did not adjudicate the new recidivism evidence because it did not exist at the time of Rick's commitment. Thus, because this is a motion to dismiss, this Court considers that evidence under Rule 12(b)(6) of the Federal Rules of Civil Procedure, construing the unadjudicated facts in the light most favorable to Rick and drawing all reasonable inferences in his favor. *Juniper v. Zook*, 876 F.3d 551, 564 (4th Cir. 2017).

## II.      Timeliness under 28 U.S.C. Section 2244(d)(1)(D)

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress established a one-year statute of limitations period for petitioners seeking federal habeas relief from state court judgments. 28 U.S.C. § 2244(d)(1). The limitations period generally begins on the date that the judgment of the state court became final, *id*.

§ 2244(d)(1)(A), in which case Rick's habeas petition—filed years after his civil commitment became final—is untimely. Rick contends that Section 2244(d)(1)(D) applies, under which the limitations period begins to run on the date that the "factual predicate of [his] claim or claims presented could have been discovered through the exercise of due diligence." *Id.* § 2244(d)(1)(D). The parties dispute the application of Section 2244(d)(1)(D). The resolution of its application turns on (1) how the factual predicates of Rick's due process claim are defined; and (2) whether Rick could have discovered these predicates earlier by exercising proper due diligence.

### A. Factual Predicates

The factual predicates of claims are the "vital facts underlying those claims." *Martin v. Fayram*, 849 F.3d 691, 696 (8th Cir. 2017) (citations omitted). "Knowledge of the vital facts of a claim may be distinct from knowledge of their legal significance, or from evidence used to support the claim." *Id.* (internal quotation and citations omitted). The R&R found that the factual predicates of Rick's due process claim are Dr. Phenix's April 2019 report and Drs. Alberg's and Sweet's later opinions that Rick's commitment as an SDP was inappropriate in 2004 (together, "2019 opinions").[5] (R&R at 11.) Hennepin County contends that the factual predicates of Rick's claim are not the 2019 opinions; rather, the predicates are the evidence that sparked those opinions. (Obj. at 2.) The time

---

[5] As explained in more detail in Section IV.C below, Rick's petition raises each of the 2019 opinions in support of his due process claim. (*See* ECF No. 1 at 6–9.)

8

gap between these two is significant: Drs. Phenix, Alberg, and Sweet authored their opinions in 2019; the evidence underlying their opinions appears to have been available by 2012 at the latest. (*See, e.g.*, ECF No. 1 at 9 (referencing 2009 Study); Heisler Aff. Ex. 7 at 4 n.2, 7–8 (relying on 2009 and 2012 Studies).)

In habeas cases, the Eighth Circuit has considered the distinction between knowledge of vital facts, on the one hand, and the way in which those facts are gathered and presented, on the other. *Earl v. Fabian*, 556 F.3d 717, 726 (8th Cir. 2009). The knowledge of the facts themselves is the factual predicate; the way in which they are packaged are not. "Section 2244(d)(1)(D) does not convey a statutory right to an extended delay while a habeas petitioner gathers every possible scrap of evidence that might support his claim." *Id.*, quoted in *Jimerson v. Payne*, 957 F.3d 916, 927 (8th Cir. 2020). In *Earl*, the petitioner claimed that he could not have discovered the factual predicate of his habeas claim until he received his case file. 556 F.3d at 725. He argued that his petition was timely under Section 2244(d)(1)(D) because he filed it within four months of receiving the file. *Id.* The Eighth Circuit rejected this argument, explaining that the petitioner was "confusing his knowledge of the factual predicate of his claim with [the process of] gathering evidence in support of that claim." *Id.* at 726 (citation omitted). "A desire to see more information in the hope that something will turn up differs from the factual predicate of a claim or claims for purposes of 2244(d)(1)(D)." *Id.* (citation omitted). Because Earl had raised the same constitutional claim in his prior state court proceedings,

he knew the factual predicate of that claim well before he received his case file, and thus, his habeas petition was untimely under Section 2244(d)(1)(D).[6] *Id.* at 725–26.

Consistent with the principle in *Earl*, when presented with expert reports supporting a habeas petition, district courts outside this circuit have looked beyond the dates of those reports to consider whether the petitioner could have discovered the underlying evidence earlier. *E.g.*, *Danko v. Stephens*, No. 3:15-CV-2683-L-BK, 2016 WL 791496, at *2 (N.D. Tex. Jan. 20, 2016) (finding § 2244(d)(1)(D) did not apply despite "newly discovered evidence" of reports by ballistics experts where petitioner "fail[ed] to show that he could not have discovered the evidence before his conviction became final"), *report and recommendation adopted*, 2016 WL 775850 (N.D. Tex. Feb. 29, 2016); *Bowman v. Martin*, No. CIV-19-542-HE, 2019 WL 7144120, at *8 (W.D. Okla. Nov. 25, 2019) ("[T]he relevant date for purposes of § 2244(d)(1)(D) is the date the factual predicate of his claim of mental illness could have been discovered, not the date Petitioner managed to obtain [the doctor's] Affidavit [diagnosing Petitioner's mental illness]"), *report and*

---

[6] Other circuits agree. *See, e.g., In re Young*, 789 F.3d 518, 528 (5th Cir. 2015) ("The date that the facts supporting the claim could have been discovered through due diligence does not equate to the date on which the movant possesses evidence to support the claim."); *Taylor v. Martin*, 757 F.3d 1122, 1124 (10th Cir. 2014) ("The 'factual predicate' of Mr. Taylor's claim is that Mr. Cheatham lied when he testified on May 6, 2009, not that he swore out an affidavit to that effect in August 2011.").

*recommendation adopted*, No. CIV-19-0542-HE, 2019 WL 7116113 (W.D. Okla. Dec. 23, 2019).[7]

The Court will likewise look beyond the dates of the 2019 opinions to determine whether Rick could have discovered the research advancements underlying those opinions through the exercise of due diligence. *Earl*, 556 F.3d at 726.

### B. Due Diligence

Under Section 2244(d)(1)(D), "the statutory clock begins ticking when the factual predicate was or could have been 'discovered.'" *Dixon v. Wachtendorf*, 758 F.3d 992, 994 (8th Cir. 2014). "Due diligence does not require repeated exercises in futility or exhaustion of every imaginable option, but it does require 'reasonable efforts.'" *Deroo v. United States*, 709 F.3d 1242, 1245 (8th Cir. 2013) (citation omitted). A petitioner can show diligence by his "prompt action . . . as soon as he is in a position to realize that he has an interest in challenging the prior conviction." *Jimerson*, 957 F.3d at 927 (quoting *Johnson v. United States*, 544 U.S. 295, 308 (2005)).

---

[7] *See also Lamonica v. United States*, No. 3:09-CR-235-D, 2019 WL 3804982, at *3 & n.3 (N.D. Tex. June 13, 2019) (finding that a motion was not timely under 28 U.S.C. § 2255(f)(4) where movant failed to show that he could not have discovered the facts supporting his claim through due diligence before his conviction was final in 2010, despite firearms expert reports dated 2016 and 2017), *report and recommendation adopted*, No. 3:09-CR-235-D, 2019 WL 3803665 (N.D. Tex. Aug. 13, 2019). As Hennepin County acknowledges, the statute of limitations in Section 2255(f)(4) is "[e]ssentially identical" to the one-year limitation in Section 2244(d)(1)(D). (ECF No. 42 at 10 n.5.)

Hennepin County contends that Rick did not exercise due diligence in discovering the research advancements underlying the psychologists' 2019 opinions. (Obj. at 3–4.) It offers evidence that Rick had been working with an attorney for years before 2019. (*E.g.*, ECF No. 41 at 161–163 (order summarizing counsel's efforts on Rick's behalf in 2015–2017).) It insists that Rick, his attorney, and the psychologists had ample opportunity to learn of the publicly-available 2012 Study, and that Rick does not allege any facts showing that they tried to discover the new recidivism data. (ECF No. 42 at 10.)

Citing no legal authority, Rick argues that the Court should consider only whether he—and not his attorney—acted with due diligence. (ECF No. 57 ("Pet's Resp.") at 2–3; ECF No. 44 at 3–4.) But the Eighth Circuit recently imputed the standard to a petitioner's attorney, holding that a petitioner was deemed to have discovered the factual predicate for her constitutional claim once the petitioner's attorney learned of the information at issue.[8] *Jimerson*, 957 F.3d at 925 ("It is indisputable, however, that once Jimerson's counsel identified the informant by name and talked directly with him, Jimerson had discovered the factual predicate for her [constitutional] claim.").

Rick attested that since being confined to the MSOP in 2004, he has lacked access to materials that would keep him up-to-date on risk assessment research or data

_____

[8] It is also true that courts consider a petitioner's physical confinement when conducting a due diligence inquiry. *E.g.*, *Easterwood v. Champion*, 213 F.3d 1321, 1323 (10th Cir. 2000) (noting that evaluation of due diligence should be considered in light of a *pro se* petitioner's confinement and any special restrictions that incarceration might impose). But here, Rick had been represented by counsel before 2019.

evaluating sexual recidivism, and is not familiar with the training, research, and data that psychologists use to make clinical judgments about recidivism. (ECF No. 4 ¶¶ 2–3; *see also* ECF No. 46 ¶¶ 2–3 (attesting that MSOP treatment providers did not disclose to Rick that that the tools used to evaluate sex offender recidivism were flawed or that past recidivism rates had been exaggerated).) Rick also attested that it was his attorney who suggested looking into whether advancements in research on sexual recidivism testing tools and clinical judgments would cast doubt on the reliability of his initial commitment; his attorney consulted with Drs. Phenix, Alberg, and Sweet; and, upon receiving the psychologists' 2019 opinions, Rick asked his attorney to file the petition. (ECF No. 4 ¶ 4.)

But Rick does not clarify *when* his attorney or the psychologists learned of the research advancements and does not explain why they could not have discovered the publicly-available 2012 Study before 2019. And although Rick's attorney may not have understood the legal significance of the new evidence until 2019, the time to file begins when the petitioner "knows (or through diligence could discover) the important facts, not when the [petitioner] recognizes their legal significance." *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000); *see Martin*, 849 F.3d at 696 (holding that knowledge of "'vital facts' of a claim may be distinct from knowledge of their 'legal significance'"). Without this evidence, Rick has not met his burden of showing due diligence in discovering the research advancements underlying the psychologists' 2019 opinions. *See Ingram v. United States*, 932 F.3d 1084, 1091 (8th Cir. 2019) (concluding that petitioner did not exercise due

diligence in discovering facts in a commission report where he did not explain "why he could not have acted sooner to bring his [constitutional] claim based on facts revealed in the [report]").

For these reasons, the Court finds that Rick has failed to prove that his petition is timely under Section 2244(d)(1)(D). Thus, it is time-barred unless the actual-innocence exception (addressed below) applies.

### III.    Actual-Innocence Gateway Exception

The R&R concluded that even if Rick's petition were untimely, it could be considered under an actual-innocence exception to the AEDPA's statute of limitations. Hennepin County disagrees, arguing that the actual-innocence exception, found in criminal case law, does not apply in the civil commitment context. (Obj. at 4–7.) In the criminal conviction context, a petitioner may invoke the actual-innocence exception to overcome the expiration of AEDPA's one-year statute of limitations. *McQuiggin v. Perkins*, 569 U.S. 383, 391–92 (2013) (also calling it the "fundamental miscarriage of justice" exception). Under this exception, a petitioner's actual innocence serves as a "gateway" to habeas review.[9] *Rouse v. United States*, --- F.4d ---, No. 20-2007, 2021 WL 4202105, at *3 (8th Cir. Sept. 16, 2021) (quoting *McQuiggin*, 569 U.S. at 386). The gateway is a narrow one: actual-innocence claims "must be supported by 'new reliable evidence .

---

[9] Whether freestanding claims of actual innocence are cognizable remains an open question. *Rouse*, --- F.4d ---, 2021 WL 4202105, at *4 n.4 (citing *McQuiggin*, 569 U.S. at 392).

. . that was not presented at trial' and convinces the court it is 'more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Id.* at *3 n.3 (quoting *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995)). The evidence of innocence must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggin*, 569 U.S. at 401 (quoting *Schlup*, 513 U.S. at 316).

### A.  Application to Civil Commitments

Neither the Supreme Court nor the Eighth Circuit has addressed whether the actual-innocence exception applies in the civil commitment context. As Hennepin County acknowledges, courts have addressed this issue in dicta. In *Schmidt v. McCulloch*, the district court dismissed a habeas petition because the civilly committed petitioner failed to exhaust his state remedies. 823 F.3d 1135, 1137 (7th Cir. 2016). The petitioner asserted a "fundamental miscarriage of justice" exception to the exhaustion requirement: that "he wasn't too dangerous [at the time of his commitment] to be given his freedom." *Id.* The Seventh Circuit described his "fundamental miscarriage of justice" claim as "a parallel claim to the conventional 'actual innocence' excuse for procedural default," and found it "close enough" to "assume that the excuse applies in the civil commitment context." *Id.* Under this assumption, the court considered the merits of the petitioner's due process

claim and found that his due process rights were not infringed.[10] *Id.* (noting the appeal argued "not innocence, but that ineffective assistance of counsel" violated petitioner's due process); *see also Brown v. Watters*, 599 F.3d 602, 610 (7th Cir. 2010) (noting the proper application of the actual-innocence exception to civil commitment cases is "a difficult one.").

In *Beaulieu v. Minnesota*, a petitioner challenged his civil commitment at the MSOP, and the court found that the petitioner had procedurally defaulted on certain claims. No. 06-CV-4764 (JMR/JSM), 2007 WL 2915077, at *3–5 (D. Minn. Oct. 4, 2007). Although the petitioner did not assert that the actual-innocence exception applied, the court noted in dictum that the "natural extension to a civil commitment proceeding would be that the [actual-innocence] exception is available upon a showing, based on new evidence, that a constitutional violation has probably resulted in Petitioner being classified as a SDP . . . ."[11] *Id.* at *4 n.4.

---

[10] Similarly, in *Shannon v. Minnesota Department of Corrections*, the court "assum[ed] solely for the sake of argument that a petitioner challenging his civil commitment can rely on the actual-innocence gateway given that civil commitment is not exclusively based upon a finding of guilt." No. 18-CV-646 (WMW/LIB), 2019 WL 3325834, at *6 (D. Minn. June 4, 2019), *report and recommendation adopted*, 2019 WL 3322918 (D. Minn. July 24, 2019). The *Shannon* court found that the petitioner "failed to make any threshold showing of innocence" sufficient to justify the matter proceeding despite the untimely filing of his petition. *Id.*

[11] In *Levine v. Torvik*, the Sixth Circuit considered whether a civilly committed petitioner had presented his constitutional claims to the state court. 986 F.2d 1506, 1517 (6th Cir. 1993). The court noted in dictum that even if the petitioner had not presented his claim that he was not mentally ill, the court would consider it under the actual-innocence

The Court finds the reasoning in these opinions persuasive, particularly given the Supreme Court's admonishment that "[s]ensitivity to the injustice of incarcerating an innocent individual should not abate when the impediment is AEDPA's statute of limitations." *McQuiggin*, 569 U.S. at 393. The actual-innocence exception "is grounded in the '*equitable discretion*' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Id.* at 392 (citing *Herrera v. Collins*, 506 U.S. 390, 404 (1993)) (emphasis added); *see id.* at 397–98 (explaining that Congress enacted AEDPA "without losing sight of the fact that the writ of habeas corpus plays a vital role in protecting constitutional rights") (citation omitted). In considering whether to apply the actual-innocence gateway exception, the Supreme Court has sought to "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." *Id.* at 393 (quoting *Schlup*, 513 U.S. at 324). When a civilly committed person claims actual innocence based on new reliable evidence, the person's interest in justice may indeed outweigh these societal interests.

Hennepin County argues that the actual-innocence exception should not apply to civil commitments because unlike a criminal verdict, the decision to civilly commit a person for sex offender treatment is "subject to constant re-evaluation and can be changed

---

doctrine of *Murray v. Carrier*, 477 U.S. 478, 496 (1986). *Id.* at 1517 n.9. As the R&R acknowledges, *Murray* was the pre-AEDPA standard, and *Levine* pre-dated *Schlup* and *McQuiggin*. (R&R at 16.)

at any time though Minnesota's statutory process." (ECF No. 42 at 14); *see Call v. Gomez*, 535 N.W.2d 312, 318–19 (Minn. 1995) ("[O]nce a person is committed, his or her due process rights are protected through procedural safeguards that include periodic review and re-evaluation, . . . [and] the opportunity to petition for full discharge.") (citation omitted). Minnesota provides a process for persons to petition for full discharge from civil commitment. *E.g.*, Minn. Stat. § 253D.31. But Rick challenges his original commitment, and Minnesota's statutory process has no jurisdiction to handle such claims.[12] (ECF No. 35 at 8.) In the context of civil commitments, the actual-innocence gateway exception would necessarily be limited to petitioners challenging their original commitment, *i.e.*, claims that the petitioner should not have been committed in the first place, not that the petitioner now satisfies the requirements for discharge.

For these reasons, the Court concludes that the actual-innocence gateway exception may apply in the civil commitment context. For the exception to apply, the petitioner must persuade the court that, in light of new reliable evidence, it is more likely than not that no reasonable jurist would have ordered the person's civil commitment. *McQuiggin*, 569 U.S. at 386; *Schlup*, 513 U.S. at 324, 327. As in the criminal context, "[t]his

---

[12] Rick had alleged two claims: (1) new evidence shows that his initial commitment was unconstitutional; and (2) new evidence renders his continued commitment unconstitutional. The Court found that Rick could bring the first claim because no state process to exhaust that claim existed. (ECF No. 35 at 8–9.) The Court required Rick to exhaust his state remedies before bringing the second claim. (*Id.* at 11; ECF No. 37.)

'demanding' standard of proof will only be successful in 'extraordinary' circumstances."
*Rouse*, --- F.4d ---, 2021 WL 4202105, at *3 n.3 (citation omitted).

### B. Rick's Actual Innocence

Hennepin County contends in passing that "in reviewing the evidence as a whole
([ECF No. 24] at 15–36), there is an insufficient basis to conclude that it is more likely than
not that no reasonable jurist would have found by clear and convincing evidence that
Rick was highly likely to sexually reoffend." (Obj. at 7.) Hennepin County does not
address the R&R's finding that, assuming the actual-innocence exception applies to
civilly committed petitioners, Rick has stated a plausible actual-innocence gateway claim
sufficient to survive the motion to dismiss. (R&R at 8–9, 21–22.) Nor does Hennepin
County raise any specific objection to the finding that Rick has presented enough
evidence to warrant an evidentiary hearing to determine whether he satisfies the
elements of the actual-innocence exception. (R&R at 22.)

Though the objections may lack specificity, the Court has nonetheless reviewed
the R&R's findings *de novo*. The Court agrees with Judge Shultz's thorough analysis, and
finds that Rick has presented enough evidence to warrant an evidentiary hearing on the
actual-innocence gateway exception. (R&R at 18–22.)

### IV.    Legal Merits of the Due Process Claim

Hennepin County also challenges the R&R's finding that Rick states a cognizable
due process claim. (Obj. at 7–11.) Rick alleges a due process violation based on evidence

discovered after his commitment which he argues "undermined and discredited the critical risk assessment tools and clinical assumptions" on which the state court based his commitment, rendering his initial commitment a "fundamental miscarriage of justice." (2d Am. Pet. at 3–4.) In the habeas context, federal courts generally review admissibility-of-evidence questions "only to determine whether an alleged error infringes upon a specific constitutional protection or is so prejudicial as to be a denial of due process." *Rousan v. Roper*, 436 F.3d 951, 958 (8th Cir. 2006) (citation omitted). To prevail, a petitioner must show that "the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Id.* at 958–59 (citation omitted).

### A. Constitutional Claims Based on New Scientific Evidence

The Eighth Circuit has not decided whether new scientific information showing that a petitioner's conviction resulted from "false testimony" violates a petitioner's right to due process. *Rhodes v. Smith*, 950 F.3d 1032, 1036 n.2 (8th Cir. 2020). But in *Rhodes*, the court "assumed for purposes of the argument" that such claims were constitutional violations. *Id.*; *see also Feather v. United States*, No. CIV 18-4090, 2020 WL 5517198, at *12 (D.S.D. Sept. 14, 2020) (assuming, without deciding, that a due process claim based on the introduction of flawed scientific testimony is cognizable in the Eighth Circuit), *appeal filed*, No. 20-3371 (8th Cir. Nov. 12, 2020).

At least two circuits have recognized that habeas petitioners can allege a constitutional violation based on the introduction of flawed expert testimony at a criminal trial. The Third Circuit recognized a petitioner's due process claim based on new scientific evidence, and required the petitioner to "show that the admission of the [disputed] expert testimony undermined the fundamental fairness of the entire trial because the probative value of that evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission." *Lee v. Houtzdale SCI*, 798 F.3d 159, 165 (3d Cir. 2015) (citation and brackets omitted). The *Lee* court affirmed the habeas relief granted to the petitioner because his conviction rested on flawed arson forensics that the government conceded were proven invalid by subsequent scientific developments, and the government failed to present "'ample evidence' sufficient to prove [the petitioner's] guilt beyond reasonable doubt." *Id.* at 167, 169 (citation omitted).

The Ninth Circuit followed *Lee* "in recognizing that habeas petitioners can allege a constitutional violation from the introduction of flawed expert testimony at trial if they show that the introduction of this evidence 'undermined the fundamental fairness of the entire trial.'" *Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016) (quoting *Lee*, 798 F.3d at 162). In *Gimenez*, the petitioner offered affidavits from new experts that allegedly contradicted the government's expert testimony at trial about the victim's cause of death. *Id.* at 1142–43. Ultimately, the Ninth Circuit rejected the petitioner's claim: "[t]o the extent that this new testimony contradicts the prosecution's expert testimony, it's simply a

difference in opinion—not false testimony."[13] *Id.* at 1142; *see also Feather*, 2020 WL 5517198, at *9–12 (discussing *Lee* and *Gimenez,* and after "[a]ssuming such a due process claim is cognizable in the Eighth Circuit," finding the petitioner's new evidence "did not undermine the fundamental fairness of the entire trial").

The R&R found that *Lee* and *Gimenez* align with the Eighth Circuit's assumption in *Rhodes.* (R&R at 25–28.) Hennepin County argues that the R&R erred in doing so.[14] (Obj. at 9.) After carefully considering these circuit court opinions, this Court likewise concludes that a due process claim can be based on new scientific evidence where the petitioner "show[s] that the admission of the [disputed] expert testimony undermined the fundamental fairness of the entire trial." *Lee*, 798 F.3d at 165.

## B.  Application to Civil Commitments

Hennepin County contends that although "it may make sense to recognize evidence-based due process violations in the context of criminal convictions," this due process claim should not apply to civil commitments because they offer "a forum to present evidence about new science" on the likelihood of recidivism. (Obj. at 10.)

---

[13] *Gimenez* involved successive petitions for habeas relief, requiring the petitioner to prove by "clear and convincing evidence" that "no reasonable factfinder" would have found him guilty but for the introduction of purportedly flawed testimony. 821 F.3d at 1142 (quoting 28 U.S.C. § 2244(b)(2)(B)(ii)). Gimenez could not do so. *Id.* at 1145.

[14] Hennepin County argues in passing that the Court should not extend the legal theory advanced in *Lee* and *Gimenez* to civil commitments for the same reasons it raised about the actual-innocence exception. (Obj. at 9.) The Court addressed and rejected these arguments for the reasons provided above.

Hennepin County asserts that rather than trying to "undo his commitment that was the result of a perfectly fair trial at the time it occurred," Rick can present evidence that he poses a low risk of re-offending to a judicial appeal panel. (*Id.*) As noted above, the state provides a process for Rick to petition for discharge from the MSOP, but there is no state process to challenge his initial commitment as fundamentally unfair. Rick argues that the state review process is inadequate because it requires him to prove more than the initial commitment, specifically, that he can make "an acceptable adjustment to open society," Minn. Stat. § 253D.31, and has a specific and acceptable discharge plan. (Pet's Resp. at 6.) Although the state review process might lead to Rick's full release from the MSOP, that decision to release him will not invalidate his original commitment.

### C. Application to Rick

Hennepin County argues that even if the Court recognizes an evidence-based due process violation in the context of civil commitment, the outdated recidivism data "played only a minor, if any, role" in Rick's commitment, and thus Rick cannot show the result was fundamentally unfair. (Obj. at 10–11.) But the state court's 2004 Order suggests the experts' opinions, which relied on the flawed data, may have played an important role in Rick's commitment. *See Ince*, 847 N.W.2d at 24 (noting courts "rely so heavily on the opinions of experts" in civil commitment cases).

The state court specifically addressed Rick's withdrawal from treatment and Drs. Alberg's and Sweet's opinions that Rick had a moderate risk of recidivism, concluding

that Rick's "moderate risk of recidivism combined with not completing sex offender treatment . . . proved by clear and convincing evidence that there is a likelihood of [Rick] reoffending." (2004 Order at 6–7, 11, 17.) The court also addressed Dr. Alsdurf's conclusions that Rick met the criteria as an SDP "noting that [Rick] had not completed treatment," had a high likelihood of reoffending, and should be committed to the MSOP. (*Id.* at 13.) Based on this evidence, the court found that Rick met the criteria as an SDP. (*Id.* at 14.)

Now, years later, the psychologists' 2019 opinions raise serious questions about the role the outdated recidivism data played in Rick's commitment. *First*, Rick alleges that Dr. Alberg, "in light of the improvement in risk assessment actuarial testing and more recent research regarding sex offender recidivism rates . . . not available at the time of Rick's commitment hearings . . . conclude[d] that Rick in fact had a low likelihood of sexual recidivism at the time he was committed," that his 2004 report gave "undue emphasis" to the fact that Rick withdrew from treatment, and thus "it was an error for Rick to be civilly committed as an [SDP] in 2004." (2d Am. Pet. at 6–7; *see* Heisler Aff. Ex. 4.) *Second*, Rick alleges that Dr. Sweet, based on new data showing a lower risk of recidivism for sex offenders released in 2003 and 2006, as well as "[m]ore recent findings indicat[ing] that dropping out of treatment is not a significant factor contributing to increased recidivism rates," concluded that "if this updated and more accurate information had been available to him in 2004–2006, he would have concluded that Rick

24

did not meet the criteria as [an SDP]." (2d Am. Pet. at 7; *see* Heisler Aff. Ex. 6.) *Third*, Rick alleges that Dr. Phenix reviewed Rick's case and found that: "[s]ubsequent research" demonstrated that recidivism rates used at the time of Rick's commitment were "outdated" and overestimated his likelihood of recidivism; and the emphasis on Rick's withdrawal from treatment was "problematic" given the 2009 Study of the effect of treatment completion on recidivism rates. (2d Am. Pet. at 8–9; *see* Heisler Aff. Ex. 7.) Dr. Phenix concluded that, based on the overinflated recidivism rates resulting from outdated actuarial tools used at his commitment, combined with the examiners' overemphasis on Rick's withdrawal from treatment, Rick did not meet the criteria as an SDP when he was committed. (2d Am. Pet. at 9; *see* Heisler Aff. Ex. 7.)

In deciding to civilly commit Rick, the state court considered all the evidence presented, including Drs. Alberg's and Sweet's opinions that Rick met the criteria as an SDP. The record shows that it was a very close case. The 2019 opinions, which rely on the new recidivism evidence, are critical because Drs. Alberg and Sweet now conclude that Rick did not meet the criteria as an SDP at the time of his initial commitment. The Court finds that the 2019 opinions raise important questions about the fundamental fairness and reliability of Rick's commitment hearing, and thus denies Hennepin County's motion to dismiss. If, after an evidentiary hearing, Rick proves the actual-innocence exception applies, an evidentiary hearing will be held on the merits of Rick's due process claim.

V.      *In re Linehan*

Finally, Hennepin County argues that the R&R erred by failing to apply the Minnesota Supreme Court's decisions in *In re Linehan ("Linehan I")*, 518 N.W.2d 609, 611 (Minn. 1994), and *Linehan III*, 557 N.W.2d at 175. (Obj. at 11–13 (citing ECF No. 42 at 16–19).) The *Linehan* opinions set forth factors that courts should consider when predicting whether a person poses a serious danger to the public:

> (a) the person's relevant demographic characteristics . . . ; (b) the person's history of violent behavior . . . ; (c) the base rate statistics for violent behavior among individuals of this person's background . . . ; (d) the sources of stress in the environment . . . ; (e) the similarity of the present or future context to those contexts in which the person has used violence in the past; and (f) the person's record with respect to sex therapy programs.

*Linehan I*, 518 N.W.2d at 614; *see Linehan III*, 557 N.W.2d at 189 ("[T]he guidelines for dangerousness prediction in *Linehan I* apply to the SDP Act."). The Minnesota Supreme Court has admonished that "with the benefit of all the relevant and *reliable* evidence, the district court must make a 'good faith attempt[] . . . to isolate the most important factors in predicting harmful sexual conduct.'" *Ince*, 847 N.W.2d at 23 (emphasis added, quoting *Linehan III*, 557 N.W.2d at 189). As the trier of fact, the state court is "in the best position to determine the weight to be attributed to each factor," and performs the "critical function" of evaluating the credibility of witnesses in a case that "rel[ies] so heavily on the opinions of experts." *Id.* at 23–24 (citations omitted).

According to Hennepin County, the R&R ignored the last *Linehan* factor—"the person's record with respect to sex therapy programs"—thereby "implicitly strik[ing]

down the requirement that a state court consider this factor." (Obj. at 11–12.) The Court

disagrees. In deciding that Rick met the criteria as an SPD, the state court considered

Rick's record on therapy programs and the experts' opinions on how his record impacted

his likelihood of reoffending. (*E.g.*, 2004 Order at 6–7, 11, 13, 17.) Certain experts on whom

the court relied now conclude that Rick did not meet the criteria as an SPD when

committed, in part because the data relating to sex offenders' treatment records was

unreliable.[15] Given this new evidence, the state court might have ascribed a different

weight to the "record with respect to sex therapy" factor at the time of Rick's

commitment. The R&R's decision does not affect the *Linehan* factors or the state court's

ability to determine the weight to be attributed to each factor.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.      Hennepin County's Objection (ECF No. 56) is SUSTAINED IN PART and

        OVERRULED IN PART;

---

[15] Hennepin County challenges the R&R's statement that "research published since Ricks' commitment demonstrated that failure to complete sex offender treatment . . . did not increase the risk of recidivism, *as the prior evaluators had assumed*." (R&R at 6 (emphasis added).) Although Dr. Alsdurf did not make this assumption, Dr. Alberg undisputedly opined that Rick's withdrawal from treatment suggested a higher risk of recidivism. (Obj. at 12; *see* Heisler Aff. Ex. 4 at 1 (stating that Rick's "treatment dropout was an overriding consideration leading towards civil commitment").) And Dr. Sweet's 2019 opinion states that Rick's decision to withdraw from the treatment program was a "significant factor" in his prior opinion that Rick met the criteria of an SDP. (Heisler Aff. Ex. 6 at 2.)

2.     The Report and Recommendation (ECF No. 53) is ACCEPTED AS MODIFIED; and

3.     The Motion to Dismiss (ECF No. 40) is DENIED.

4.     The Magistrate Judge will hold an evidentiary hearing on the issue of whether Rick satisfies the elements of the actual-innocence exception to overcome the AEDPA's statute of limitations. If the Court finds that Rick satisfies the actual-innocence exception, an evidentiary hearing on the merits of Rick's due process claim will be held. The Magistrate Judge, in his discretion, may hold both of these hearings together.

Dated: September 30, 2021                      BY THE COURT:

                                               s/Nancy E. Brasel
                                               Nancy E. Brasel
                                               United States District Judge