## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

DARRIN SCOTT RICK,

           Petitioner,

v.

JODI HARPSTEAD, Commissioner,
Minnesota Department of Human
Services,

           Respondent.

Case No. 19-CV-2827 (NEB/DTS)


AMENDED ORDER ON REPORT AND
RECOMMENDATION

---

In what the parties agree was a very close case, a Minnesota court civilly committed Petitioner Darrin Scott Rick as a sexually dangerous person in 2004. He has been a patient of the Minnesota Sex Offender Program ("MSOP") ever since. In 2019, Rick petitioned for writ of habeas corpus under 28 U.S.C. Section 2254, seeking his release from custody based on newly discovered evidence. After holding an evidentiary hearing on the petition, United States Magistrate Judge David T. Schultz issued a Report and Recommendation recommending that the Court grant Rick's petition. (ECF No. 94 ("R&R").) Hennepin County[1] objects to the R&R. (ECF No. 100 ("Obj.").) After a *de novo* review, the Court overrules the objection, accepts the R&R, and grants the petition.

---

[1] Jodi Harpstead, the Commissioner of the Minnesota Department of Human Services, is the named Respondent who is holding Rick in state custody. *Rick v. Harpstead*, 564 F. Supp. 3d 771, 775 n.1 (D. Minn. 2021). Hennepin County responds on Harpstead's behalf in defense of the commitment order because it petitioned for Rick's commitment. *Id.*

## BACKGROUND

The R&R details the facts and procedural history of the case. (R&R at 2–10.) The Court lays out the facts necessary for context.[2]

*Criminal conviction.* In 1993, Rick pled guilty to four counts of criminal sexual conduct involving minors and was sentenced to 180 months in prison. *In re Civ. Commitment of Rick*, No. A06-1621, 2007 WL 333885, at *1 (Minn. Ct. App. Feb. 6, 2007). While in prison, Rick participated in but eventually withdrew from sex-offender treatment. (R&R at 2.) After the Minnesota Department of Corrections ("DOC") declined to recommend Rick for civil commitment, Hennepin County began its own civil commitment proceedings. (*Id.*)

*2004 commitment trial.* During Rick's civil-commitment trial, court-appointed expert psychologists Dr. Thomas Alberg and Dr. Roger Sweet testified that Rick met Minnesota's statutory definition for a "sexually dangerous person" ("SDP").[3] (*Id.* at 3.)

---

[2] The Court cites the R&R and incorporates the citations it contains.

[3] Under Minnesota law, an "SDP" is a person who:
> (1) has engaged in a course of harmful sexual conduct as [statutorily defined];
> (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and
> (3) as a result, is  likely to engage in acts of harmful sexual conduct as [statutorily defined].

Minn. Stat. § 253B.02, subdiv. 18c (2004) (now codified at Minn. Stat. § 253D.02, subdiv. 16(a) (2020)). Minnesota courts interpret the statute to require a person to be "highly likely" to engage in acts of harmful sexual conduct. *In re Linehan (Linehan III)*, 557

But they also concluded that the MSOP program was unnecessary for Rick's treatment. (*Id.* at 3–4.) In their opinions, less-restrictive alternatives would suffice. (*Id.*) The DOC's Civil Commitment Review Coordinator testified that she believed Rick should not be civilly committed. (*Id.* at 4 (citing Ex. 1[4] at 10).) Contradictory testimony came from Hennepin County's retained psychologist Dr. James Alsdurf, who testified that the only treatment appropriate for Rick was at the MSOP. (*Id.* at 4.) The trial court found that Rick's "moderate risk of recidivism combined with not completing sex offender treatment . . . proved by clear and convincing evidence that there is a likelihood of [Rick] reoffending." (*Id.* at 5; *see* Ex. 1 at 6–7, 11, 17.) The trial court then determined that Rick met the criteria for commitment to the MSOP. (Ex. 1 at 14.) But the court stayed Rick's commitment so long as Rick complied with certain conditions, including completing an outpatient sex-offender treatment program. (*Id.*) Hennepin County appealed, and the Minnesota Court of Appeals reversed the stay, both because Hennepin County had not agreed to the stay as required by law, and because record evidence did not establish that an outpatient treatment program had accepted Rick. (R&R at 5.)

---

N.W.2d 171, 180 (Minn. 1996), *vacated sub nom.*, *Linehan v. Minnesota*, 522 U.S. 1011 (1997), *aff'd sub nom.*, *In re Linehan*, 594 N.W.2d 867 (Minn. 1999); *see also In re Civ. Commitment of Ince*, 847 N.W.2d 13, 20-22 (Minn. 2014) (reaffirming the "highly likely" interpretation from *Linehan III*).

[4] The exhibits from the habeas evidentiary hearing are identified as "Ex." The first ten exhibits are also found at ECF No. 5.

*2006 commitment hearing.* On remand, the trial court held a hearing at which it considered less restrictive treatment alternatives than commitment for Rick. (*Id.* at 6.) This time, the evidence showed that an outpatient treatment program had accepted Rick, but Dakota County (the county in which Rick planned to live) required Rick to live in a halfway house for 90 days. (*Id.*) The DOC had approved Rick for only a 60-day stay in a halfway house, and the house refused to accept Rick as a "private pay" client for the remaining 30 days. (*Id.* at 6–7.) Because the DOC had not approved funding for the full 90 days, the court found that Rick had not shown that a less-restrictive plan was "presently available." (*Id.* at 7.) On these slim margins, the court committed Rick to the MSOP indefinitely. (*Id.*) Rick sought post-commitment relief, but he did not succeed. (*Id.* (citing *Rick*, 2007 WL 333885).)

*New evidence.* At the time of Rick's commitment in 2004, the DOC used an actuarial sexual-recidivism risk-assessment tool called the Minnesota Sex Offender Risk Assessment Tool-Revised ("MnSOST-R"). (Ex. 7 at 3.) MnSOST-R predicted that low-risk offenders had a six-year recidivism rate of 12% and moderate-risk offenders had a six-year recidivism rate of 25%. (*Id.* at 4.) In 2012, new data changed those predictions significantly. Research on Minnesota sex offenders released from the DOC between 2003 and 2006 concluded that the recidivism rate for low-risk offenders was 3% (not 12%), and that the recidivism rate for moderate-risk offenders was 6% (not 25%). (*Id.* at 4 n.2 (citing G. Duwe & P.J. Freske, *Using Logistic Regression Modeling to Predict Sexual Recidivism: The*

4

*Minnesota Sex Offender Screening Tool-3 (MnSOST-3)*, Sexual Abuse: Journal of Research and Treatment, 24(4), 350–377 (2012) ("2012 Study")).) Other new research showed that a failure to complete sex-offender treatment did not increase recidivism. (*Id.* at 7–8 (citing G. Duwe & R. A. Goldman, *The Impact of Prison-Based Treatment on Sex Offender Recidivism: Evidence from Minnesota*, Sexual Abuse: Journal of Research and Treatment, 21(3), 279–307 (2009) ("2009 Study")).)

In 2019, Rick's counsel consulted forensic psychologist Dr. Amy Phenix, who evaluated Rick, reviewed his commitment case, and determined that the actuarial data used to commit Rick was no longer scientifically reliable. (R&R at 7; *see generally* Ex. 7.) Dr. Phenix concluded that although the actuarial risk-assessment tools used at the time of Rick's commitment "were appropriate for that period in time," later research showed that the tools overestimated the general probability of sex-offender recidivism and thus overestimated Rick's risk of recidivism as well. (R&R at 8; Ex. 7 at 6–8.) Applying this new research, Dr. Phenix concluded that Rick's current risk of recidivism was between 5.6% and 6.8% in five years. (Ex. 7 at 22, 26.)

Drs. Alberg and Sweet, who had testified in support of Rick's commitment, reviewed Dr. Phenix's report. They concluded that, contrary to their testimony at Rick's commitment trial, Rick did *not* meet the statutory criteria for commitment in 2004. (Exs. 4, 6.) Dr. Alberg stated that "Rick's commitment as an SDP was inappropriate in 2004."

(Ex. 4 at 2.) Dr. Sweet similarly stated that "Rick did not meet the statutory criteria necessary for commitment" as an SDP in 2004. (Ex. 6 at 4 (emphasis omitted).)

*Habeas petition.* Before the Court is Rick's petition for habeas relief under 28 U.S.C. Section 2254. (ECF No. 1.) Rick contends that his commitment is a fundamental miscarriage of justice because the Minnesota court relied on now-discredited risk-assessment evidence and expert opinions, thus violating his right to due process under the Fourteenth Amendment. (ECF No. 45 ("2d Am. Pet.") at 3–4.) Hennepin County moved to dismiss the operative petition as barred by AEDPA's statute of limitations. (R&R at 12–13.) Judge Schultz recommended that the motion be denied. (*Id.*) Over the County's objection, this Court accepted Judge Schultz's report and recommendation and ordered a hearing on the issue of whether Rick satisfied the actual-innocence exception to overcome AEDPA's statute of limitations. *Rick v. Harpstead*, 564 F. Supp. 3d 771, 787–88 (D. Minn. 2021). If Rick satisfied the actual-innocence exception, Judge Schultz was to conduct an evidentiary hearing on the merits of Rick's due-process claim. *Id.* The parties agreed to present both the actual-innocence issue and the merits of the petition at the same hearing. (R&R at 14.)

*Habeas hearing.* In December 2021, Judge Schultz held a three-day evidentiary hearing at which five witnesses testified and 21 exhibits were presented. (*Id.* at 14–22.) Drs. Phenix, Sweet, and Alberg testified on Rick's behalf. (*Id.* at 14–18.) Hennepin County called Dr. Alsdurf and forensic psychologist Dr. Harry Hoberman. (*Id.* at 19–22.) Dr.

Hoberman was not involved in Rick's 2004 commitment proceedings; he testified about whether the evidence on which Rick's petition was based is reliable under the actual-innocence gateway test. (*Id.* at 20–21.)

*The R&R.* Having heard and seen the evidence, Judge Schultz in the R&R concluded that Dr. Phenix's hearing testimony matched her 2019 report and that the testimony of Drs. Phenix, Sweet, and Alberg was credible.[5] (*Id.* at 14–17.) Judge Schultz determined that Drs. Sweet and Alberg "recanted their 2004 opinions that Rick met the criteria to be civilly committed." (*Id.* at 19.) Judge Schultz also found Dr. Alsdurf's testimony "less credible than Drs. Sweet and Alberg regarding whether Rick met the SDP criteria in 2004." (*Id.* at 20.) He found Dr. Hoberman credible but less persuasive, and he concluded that Dr. Hoberman's testimony about sex-offender recidivism research "was not directly germane to the precise legal issues" at hand. (*Id.* at 22.)

Judge Schultz determined that Rick satisfied the actual-innocence exception to AEDPA's statute of limitations because he "demonstrated that the research and examiners' recantations are new and reliable evidence and that it is more likely than not that no reasonable jurist would have civilly committed Rick." (*Id.* at 1.) As for Rick's due-process claim, Judge Schultz concluded that Rick established that "the state court's substantial reliance on the court-appointed examiners' now-recanted testimony rendered

---

[5] Because Hennepin County objects to Judge Schultz's witness-credibility findings, the Court addresses their testimony in greater detail below.

his trial fundamentally unfair and Rick's commitment a miscarriage of justice." (*Id.*) Thus, a reasonable probability existed that "the reliance placed on the now-recanted opinions affected the outcome of Rick's commitment trial because it is unlikely a reasonable jurist considering the new evidence would commit Rick." (*Id.* at 1–2.) On this basis, Judge Schultz recommends granting Rick's habeas petition. (*Id.* at 2.)

## ANALYSIS

Hennepin County's objection to the R&R addresses both the actual-innocence exception and the due-process claim. On the actual-innocence exception, the County objects to the R&R's conclusion that the new scientific evidence is reliable, including the standard for reliability that the R&R applied. The County also objects to the R&R's evaluation of the credibility of the expert witnesses as their testimony relates to the actual-innocence exception. On the due-process claim, the County objects to the R&R's conclusion that the commitment court substantially relied on the now-recanted examiners' opinions. And the County argues that the R&R ignored several Minnesota cases and erred in finding a reasonable probability that the recanted opinions affected the outcome of Rick's commitment trial.

The Court reviews the portions of the R&R to which Hennepin County objects *de novo*, including factual findings. 28 U.S.C. § 636(b)(1); D. Minn. L.R. 72.2(b)(3). As part of that review, the Court has examined the record, including the transcripts and exhibits from the habeas hearing, the parties' proposed findings of fact, and their final arguments.

I.      **Actual-Innocence Exception: Reliability and Credibility**

In its prior order, this Court determined that a civilly committed person may invoke the actual-innocence exception to overcome the expiration of AEDPA's one-year statute of limitations for filing federal habeas petitions. *Rick*, 564 F. Supp. 3d at 781–83; *see* 28 U.S.C. § 2244(d)(1). Application of the actual-innocence exception should "remain 'rare'" and "only be applied in the 'extraordinary case.'" *Schlup v. Delo*, 513 U.S. 298, 321 (1995). For the exception to apply, Rick must persuade the Court that, "in light of new reliable evidence, it is more likely than not that no reasonable jurist would have ordered the person's civil commitment." *Rick*, 564 F. Supp. 3d at 783 (first citing *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); and then citing *Schlup*, 513 U.S. at 324, 327).

The Court must make its actual-innocence determination "in light of all the evidence," *Schlup*, 513 U.S. at 328, including evidence that became available only after Rick's commitment trial. *See House v. Bell*, 547 U.S. 518, 539 (2006) (noting that *Schlup* "requires a holistic judgment about all the evidence, and its likely effect on reasonable jurors applying the [applicable] standard" (cleaned up, citation omitted)). Evidence of innocence must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggin*, 569 U.S. at 401 (citation omitted). An actual-innocence claim must be based on new, reliable scientific evidence not presented at the original commitment trial. *Schlup*, 513 U.S. at 324.

The actuarial tools considered at Rick's commitment trial in 2004 were based on recidivism data from the 1980s and 1990s, which found Rick's recidivism risk to be low to moderate. (*See* Ex. 1 at 11–12.) At the habeas hearing, the witnesses agreed that recidivism rates for sex offenders had declined before Rick's commitment trial. (*See, e.g.*, Hr'g Tr. II at 80 (Dr. Hoberman agreeing with Dr. Phenix and Dr. Alsdurf that recidivism rates dropped), Hr'g Tr. I at 204 (Dr. Alsdurf agreeing); Hr'g Tr. III at 72 (Dr. Sweet agreeing).)

According to Hennepin County, the R&R used the wrong standard to evaluate the reliability of the new studies, and it made witness-credibility findings erroneously, without considering the entire record.[6] (Obj. at 2–10.)

### A. *Reliability of 2009 and 2012 Studies*

As noted, Rick must support his actual-innocence claim "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at [his commitment trial]." *Schlup*, 513 U.S. at 324. The R&R reasoned that "reliable evidence 'is simply

---

[6] Hennepin County also objects to the R&R's statement that the County "focuses solely on the 2009 and 2012 Studies and fails to present any argument regarding Rick's assertion that Dr. Phenix's expert opinion and Drs. Sweet's and Alberg's recantations are also new reliable evidence for purposes of the actual innocence gateway." (R&R at 25 (citing ECF No. 90 at 3–18).) Hennepin County maintains that the R&R should have also considered its proposed findings. (Obj. at 9 (citing ECF No. 91).) The Court reviews the R&R *de novo* and finds that the statement is immaterial to its decision.

evidence that is trustworthy enough to be admissible under the rules of evidence.'" (R&R at 28 (citing *United States v. KT Burgee*, 988 F.3d 1054, 1060 (8th Cir. 2021)).)

Hennepin County asserts that "trustworthiness" is the wrong standard: "Applying a standard based on trustworthiness—in the context of evidentiary admissibility—was erroneous given that Rick's claim is premised on *exculpatory scientific evidence* that forms the basis of all opinions derived therefrom and does not adequately assess the strength of the evidence of actual innocence." (Obj. at 9 (emphasis in original).) The County argues that because the 2009 and 2012 Studies are exculpatory scientific evidence, the R&R should have done more than find that they have "several indicia of reliability." (R&R at 29.) The County contends that the Court must instead ask if the Studies are scientifically valid. (Obj. at 9–10 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 n.9 (1993)).

When considering scientific evidence, "evidentiary reliability means trustworthiness." *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012) (citing *Daubert*, 509 U.S. at 590 n.9). As the County points out, evidentiary reliability of scientific evidence should be based on its "scientific validity." *Daubert*, 509 U.S. at 590 n.9. To assess scientific validity, the Court may consider the *Daubert* factors: "(1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the

theory has been generally accepted" in the relevant scientific community.[7] *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686–87 (8th Cir. 2001) (quotation marks and citation omitted); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) ("[T]he test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case.").

While the R&R did not list the *Daubert* factors or use the phrase "scientific validity," its analysis is thorough, and Judge Schultz uses some of the considerations listed in *Daubert*.[8] (*E.g.*, R&R at 29 (noting that the Studies had been published a peer-reviewed academic journal).) This Court determines that the expert opinions presented are scientifically valid, both for the reasons stated in the R&R and its own *de novo* analysis that includes consideration of the *Daubert* factors.[9]

---

[7] Courts have considered the *Daubert* factors in determining the reliability of new evidence of innocence. *See, e.g.*, *Fields v. White*, No. 15-38-ART, 2016 WL 7425291, at *3 n.1 (E.D. Ky. Dec. 22, 2016) (noting that if a "petitioner clears the first obstacle blocking the actual-innocence gateway—by presenting 'new' evidence—the *Daubert* factors would help to verify the reliability of that evidence"); *Kuenzel v. Allen*, 880 F. Supp. 2d 1205, 1223 (N.D. Ala. 2011) (recognizing that "the actual innocence assessment is not limited to strictly admissible evidence" and finding that an expert opinion was not reliable under *Daubert* because "[e]ven when the strict rules of evidence do not apply, the lack of scientific reliability undermine[d] the weight" of the medical expert's opinion).

[8] The Court is granted "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142 (emphasis in original).

[9] Hennepin County does not object to the R&R's finding that Drs. Sweet's and Alberg's written statements are new for purposes of the actual-innocence exception. (R&R at 26–

According to the County, the R&R ignored evidence that the 2009 and 2012 Studies are "not considered authoritative," and have not been cited in "significant literature" on sexual recidivism. (Obj. at 2; *see id.* at 8–9 (arguing that the Studies are not generally accepted in the field of forensic psychology and do not repudiate earlier studies).) The R&R concluded otherwise, and the Court agrees with that conclusion. The Court reviews the methodology in each study, but first, it notes that both were written by recognized DOC researchers and published in a peer-reviewed academic journal. (*See* Exs. 16–17; R&R at 29 (citing *Aims & Scope*, Sexual Abuse: J. Rsch. & Treatment, https://journals.sagepub.com/aims-scope/SAX (last visited May 17, 2023) ("The [Sexual Abuse] journal publishes rigorously peer-reviewed articles . . . .")).) Moreover, the 2009 Study has been cited in three "recent meta-analyses and/or systematic reviews of sex offender treatment." (Hr'g Tr. II at 54.)

*The 2012 Study.* The 2012 Study concluded that recidivism rates were lower for sex offenders released from Minnesota prisons between 2003 and 2006 than the rates presented at Rick's commitment trial. (*See* Ex. 17 at 357–59; Ex. 7 at 4 (comparing the recidivism rates).) In challenging the 2012 Study's reliability, Hennepin County notes that

---

28.) It is an expert witness's "opinion itself, rather than the underlying basis for it, which is the evidence presented." *Souter v. Jones*, 395 F.3d 577, 592 (6th Cir. 2005) (citing Fed. R. Evid. 702). Because Drs. Sweet and Alberg changed their opinions, "the evidence itself has changed, and can most certainly be characterized as new." *Id.* "As a result, the [recantations] can be consider[ed] 'new reliable evidence' upon which an actual innocence claim may be based." *Id.* at 593.

the Study was not a sexual-recidivism study, but an actuarial assessment instrument for the DOC.[10] (Obj. at 2.) The County argues that the 2012 Study's import is limited for a variety of reasons, including because its follow-up period was shorter than other studies and because it measured sexual recidivism by convictions, not arrests, thereby underestimating the risk of re-offense. (*See* ECF No. 90 at 5–6; Hr'g Tr. II at 20, 23, 34–35 (Dr. Hoberman's testimony); Hr'g Tr. I at 37 (Dr. Phenix explaining that "the longer the follow-up the better," but "sometimes we don't have the data that . . . goes out five, ten or fifteen years"); Hr'g Tr. III at 78–79 (Dr. Sweet acknowledging that the parameters used to measure recidivism may impact the base rate); *see also* ECF No. 90 at 4–5, 12–13 (arguing the 2012 Study is not reliable because, among other things, it was not cross-validated or independently cross validated, and its sample size included non-sexual offenses).)[11]

---

[10] The 2012 Study resulted in the development of the MnSOST-3, which the DOC then began to use to assign a risk level to offenders. (Hr'g Tr. I at 76–77.) Dr. Phenix never used the MnSOST-3 apart from this case. (*Id.*)

[11] The County also asserts that the makeup of the sample in the 2012 Study was deficient because it did not include civilly committed individuals. It argues that the recidivism base rate of 3% cited in the 2012 Study does not apply to Rick because he was committed at the time of the study. (ECF No. 90 at 7, 13; *see also* Hr'g Tr. II at 18–27; Hr'g Tr. III at 80.) This limitation does not render the Study unreliable for purposes of Rick's actual-innocence claim. It is not clear that the recidivism base rate that applied to civilly committed individuals (10.5%), (Ex. 17 at 366), is appropriately applied to Rick because the rate would have been used to determine whether to commit Rick. Even if the appropriate base rate is 10.5%, that rate is significantly lower than the 25% recidivism rate used in the MnSOST-R. (*See* Ex. 7 at 7 (noting that MnSOST-R accounted for

14

These limitations do not detract from the 2012 Study's reliability. Dr. Phenix testified that the 2012 Study's conclusion about recidivism rates being lower at the time of Rick's commitment has been borne out in other studies.[12] (Hr'g Tr. I at 38–39.) And the fact that all three forensic psychologists who participated in Rick's commitment proceeding agree that recidivism rates had declined up to and after the time of Rick's commitment suggests that this conclusion is generally accepted in the field. (*See* Hr'g Tr. I at 176; Hr'g Tr. II at 67–68; Hr'g Tr. III at 33 ("[B]y 2008, 2009, it was very clear that the base rates were consistently . . . going down. There wasn't just a blip in the curve.").)

*The 2009 Study.* The 2009 Study compared offenders who had not participated in treatment with those who had completed treatment and, relevant here, found that "[d]ropping out of treatment did not significantly increase the risk of recidivism . . . ." (Ex. 16 at 26.) At the time of Rick's commitment trial, the court-appointed examiners

---

withdrawal from treatment, and the moderate risk level had an associated recidivism rate of 25%).)

[12] For example, Rick cites a study entitled *Sex Offender Recidivism in Minnesota* published by the DOC in 2007 ("2007 Study"). (*See generally* Ex. 21.) The 2007 Study reached a similar conclusion about the decline of recidivism rates. (*See, e.g., id.* at 3 ("Since 1990, the sexual recidivism rates in Minnesota has dropped precipitously, as the three-year sexual conviction rate for 2002 releases was 3 percent compared to 17 percent for 1990 releases.").)The R&R did not address this study, noting that "numerous recidivism studies since 2004 could be brought to bear on the question of Rick's likelihood of committing future acts of harmful sexual conduct," but that Drs. Sweet's and Alberg's recantations are "the only new evidence that can be used by this Court to address, in a principled way, the second prong of the actual innocence gateway test." (R&R at 35 n.9.) The Court agrees with this position and only considers the 2007 Study when assessing the reliability of the 2012 Study.

believed that that Rick's failure to complete treatment increased his risk of reoffending. (*See* Ex. 3 at 11; Ex. 5 at 26; *see also, e.g.*, Hr'g Tr. III at 27 ("At the time that was pretty much the mantra. People who refused treatment or failed treatment or drop out of treatment are going to be more likely to re-offend.").)

Hennepin County presses that the R&R ignored evidence in the 2009 Study that the risk of re-offense increases when a person fails to complete sex offender treatment. (Obj. at 2.) The study found that this conclusion was "not statistically significant," (Ex. 16 at 22), so the Court puts no weight on the R&R's failure to address it.

At the habeas hearing, Dr. Hoberman claimed that "virtually every other study that exists in the published and unpublished world says that people who don't complete treatment have higher sex offense recidivism rates."[13] (Hr'g Tr. II at 104.) The court-appointed examiners do not agree. For example, Dr. Sweet testified that the research conflicts on the impact and importance of treatment, and he listed studies questioning the efficacy of sex-offender treatment in his report. (Hr'g Tr. III at 48–50; Ex. 6 at 3).) And Dr. Alberg explained that the effect of sex-offender treatment on recidivism is still being studied, noting that "there isn't definite evidence [that] sex offender treatment is absolutely necessary in order to reduce recidivism." (Hr'g Tr. I at 177–78.)

---

[13]Dr. Hoberman did not elaborate on this point, but his report identifies other studies that allegedly found that dropping out of treatment correlated with higher sexual-offense recidivism rates. (*See* Ex. 20 at 94–96.)

16

*Summary.* The standard for judging the evidentiary reliability of expert evidence is "lower than the merits standard of correctness." *Kuhn*, 686 F.3d at 625 (citation omitted). All sex offender-related studies have limitations. (*See* Hr'g Tr. II at 52–71.) The 2009 and 2012 Studies acknowledge their limitations, as did the witnesses who relied on them. (*See* Ex. 16 at 2–3; Ex. 17 at 514–17; *see* Hr'g Tr. II at 56–57.) The R&R acknowledged these limitations and nevertheless found that the Studies were trustworthy "on their own merits, and in light of the pre-existing evidence regarding the closeness of Rick's case."[14] (R&R at 29.) Having reviewed the hearing testimony and evidence, the Court concludes that the 2009 and 2012 Studies, although not dispositive, are reliable. Hennepin County's objection is overruled.

B.    *Witness Credibility*

Hennepin County objects to the R&R's findings about the credibility of the witnesses who testified at the habeas hearing. The Court reviews these credibility findings *de novo*. *See United States v. Lothridge*, 324 F.3d 599, 600–01 (8th Cir. 2003) (remanding because the district court failed to review *de novo* a magistrate judge's

---

[14] Hennepin County also contends that the R&R "[h]eavily weighed the Studies' origination from Minnesota" even though Drs. Sweet and Hoberman found this was insignificant. (Obj. at 2.) The R&R did not afford particular weight to the origin of the studies; it merely acknowledged—as Dr. Hoberman did—that "research specific to Minnesota provides a more accurate basis for understanding recidivism in Minnesota than does research from other states or countries." (R&R at 14; *see* Hr'g Tr. II at 14 (testifying that "one is better off if one has recidivism data that's based on the particular location").)

credibility findings); *Taylor v. Farrier*, 910 F.2d 518, 521 (8th Cir. 1990) ("[O]nce a party makes a proper objection to a magistrate's finding, including a credibility finding, the district court *must* make a de novo determination of that finding." (emphasis in original)).

1.      *Dr. Phenix*

Forensic psychologist Dr. Phenix was asked to "address the methods and procedures of the Sexual Psychopathic Personality/[SDP] evaluations that anchored the 2004 and 2006 judgments" that led to Rick's civil commitment "in the context of past and current research and professional practices and standards." (Ex. 7 at 2.) She determined that some actuarial data used to commit Rick was no longer scientifically reliable. Her report explains that later research—specifically the 2012 Study—showed that the recidivism tools used at Rick's commitment overestimated the general probability of sex-offender recidivism and thus overestimated Rick's risk of recidivism. (Ex. 7 at 6–7.) She determined that Rick's actual risk of recidivism in five years was between 5.6% and 6.8%. (*Id.* at 22, 26.) Dr. Phenix's report also explained that other new research—the 2009 Study—showed that the failure to complete sex-offender treatment did not increase the risk of recidivism. (*Id.* at 7–8.) Dr. Phenix testified about her report and conclusions at the habeas hearing. (*See generally* Hr'g Tr. I.)

Dr. Phenix testified about the strengths and limitations of the 2009 and 2012 Studies, as well as sex-offender research more generally. (*See generally id.* at 6–124.) She explained that since the early 1990s, sexual recidivism rates had consistently declined in

Minnesota, but that the actuarials used in 2004 did not reflect that decline. (*Id.* at 76; *see* Ex. 7 at 4.) No witness disputes this fact. Nor does the County.

Hennepin County objects to the R&R's finding that Dr. Phenix's testimony was "consistent with her report and . . . very credible." (R&R at 14.) But the County does not cite any testimony by Dr. Phenix that contradicts the substance of her report.[15] After reviewing Dr. Phenix's testimony, the Court finds that her testimony tracked her report.

In challenging Dr. Phenix's credibility, Hennepin County asserts that Dr. Phenix's reliance on the 2009 and 2012 Studies was flawed. As discussed, the Court has reviewed the Studies and considered their various limitations, and it finds that they are reliable for purposes of Rick's actual-innocence claim.

Hennepin County also challenges Dr. Phenix's calculations of sexual-recidivism rates. Dr. Phenix contended that, given the 2012 Study's determination that four-year reconviction base rates for the 2003–06 release cohort were 3%—down from 12.3% for the 1992 release cohort—"the estimated probability for a moderate risk individual on the MnSOST-R would have dropped from 25% to about 6%, using a new charge for a sexual offense as the criterion for sexual recidivism." (Ex. 7 at 8.) She explained that:

> In Minnesota, for example, 4-year sexual *reconviction* rates dropped from
> 12.3% for sexual offenders released in 1992 to 3% for sexual offenders
> released between 2003 and 2006. This represents a 76% decline in 4-year

---

[15] Hennepin County cites Dr. Phenix's acknowledgment that her curriculum vitae identified the wrong title of the chapter on sexual recidivism that she co-authored. (Obj. at 4; *see* Hr'g Tr. I at 65–66 (explaining she co-authored a different chapter of the book).) This error does not impinge Dr. Phenix's credibility.

sexual reconviction rates over a span of about 12 years. Assuming a comparable drop in 6-years [*sic*] sexual charge rates for new sexual offense charges, this would suggest that a moderate risk assignment for an offender released between 2003 and 2006 would be associated with about a 6% rate of sexual recidivism, defined as a new sexual offense charge, rather than the 25% rate in the older normative sample.

(*Id.* at 4 (emphasis in original) (citing the 2012 Study).) The County challenges her calculation of the percentage decline in sexual recidivism. (Obj. at 5.) At the habeas hearing, Dr. Phenix acknowledged that she calculated the 76% number herself, and that the MnSOST-R measured sexual recidivism by arrest over a six-year period, whereas the 2012 Study measured sexual recidivism by conviction over a four-year period. (Hr'g Tr. I at 88–89.) Hennepin County suggested, and Dr. Phenix agreed, that applying this percentage to an individual on the MnSOST-R was an apples-to-oranges comparison. (*Id.* at 90.) Even so, the 2007 Study found that by 2002 the recidivism rate for sex offenders rearrested was 3.8%, and reconviction rate was 3%. (Ex. 21 at 20–21.) For purposes of Rick's claim, the .8% difference is minimal. Dr. Phenix's extrapolation appears to accurately depict the significant difference between recidivism rates used in the actuarial tools for Rick's commitment, and the rates that actually applied to sex offenders in 2004 when Rick was committed.

Hennepin County also notes that Dr. Phenix had not read Minnesota Statute Section 253D in years and was not familiar with Minnesota commitment caselaw. (Obj. at 4; *see* Hr'g Tr. I at 67–68, 73–74.) Dr. Phenix's credibility about accuracy of the recidivism rates used at Rick's original commitment trial and the effect of dropping out

of treatment are fact-based, and do not require an analysis of Minnesota's commitment

law. Her lack of legal knowledge does not diminish her credibility.

    2.    *Dr. Alberg*

       Dr. Alberg was one of the court-appointed examiners who interviewed Rick in

connection with his commitment in 2004. (Hr'g Tr. I at 137–38.) At that time, Dr. Alberg

concluded that Rick "probably does meet the criteria" of an SDP. (Ex. 3 at 11; *see* Hr'g Tr.

I at 156–57; *but see* Ex. 11 at 388 (not using the term "probably").) In reaching that opinion,

Dr. Alberg found Rick's offense pattern and disordered arousal to be "critical," and his

failure to complete sex-offender training to be a "major factor" contributing to his

likelihood to offend. (Hr'g Tr. I at 138, 170; *see id.* at 152–53, 169–71.) At the time, Dr.

Alberg understood that "[p]eople who withdraw from treatment are at higher risk" of

recidivism, and he "gave that factor a great deal of significance." (*Id.* at 169, 181; *see id.* at

136 (explaining that a study had "indicated that not completing treatment was a

significant factor in predicting recidivism"); Ex. 3 at 11 ("Research has shown that people

who have . . . withdrawn from [sex-offender treatment] programs are at a much higher

risk to reoffend than people who have been untreated.").)

       In 2019, after reviewing Dr. Phenix's report and research articles regarding current

recidivism rates and the effect of treatment on those rates, Dr. Alberg concluded that Rick

should not have met the SDP criteria back in 2004. (Ex. 4 at 2; Hr'g Tr. I at 154.) He agreed

with Dr. Phenix that "treatment has only a modest effect on whether a person is likely to

reoffend, and that Mr. Rick's commitment probably was based on an overreliance on his dropping out of treatment." (Ex. 4 at 2.) Dr. Alberg testified to this effect at the habeas hearing, explaining that studies differ on the importance of completing treatment to recidivism rates, and that he possibly gave too much weight to this factor in his 2004 evaluation of Rick. (Hr'g Tr. I at 139.)

Since the 1990s, Dr. Alberg had performed about 200 to 250 initial commitment evaluations and several hundred evaluations on committed individuals seeking relief. (*Id.* at 125–26.) He could not recall a case resulting in commitment when two court-appointed examiners recommended against commitment and a retained expert recommended it, as with Rick. (*Id.* at 188.)

Hennepin County argues that the R&R erred when it found Dr. Alberg's testimony "credible and persuasive" and gave it "great weight." (R&R at 17; Obj. at 6–7.) The Court has reviewed Dr. Alberg's testimony and finds it highly credible and persuasive. Dr. Alberg reviewed Dr. Phenix's report and research articles (presumably the Studies) before deciding that Rick did not meet the SDP criteria in 2004. (Hr'g Tr. I at 173–74; Ex. 4 at 2.) He also considered several factors in Rick's record, including his history of sexual offenses and harmful sexual behavior, and his pedophilia and personality-disorder diagnoses. (Hr'g Tr. I at 152–53, 171.) Even on this record, Dr. Alberg "didn't think [Rick] strongly met the criteria" for an SDP in 2004, so his opinion in 2019 that Rick did not meet the SDP criteria "didn't change a lot but it changed a little." (Hr'g Tr. I at 154.) Hennepin

22

County's other arguments—that Dr. Alberg was retained by Rick and testified that his 2004 opinion was not false, (Obj. at 6)—do not persuade the Court that Dr. Alberg is less credible.

      3.     *Dr. Sweet*

Dr. Sweet was the other court-appointed examiner for Rick's commitment proceeding in 2004 and interviewed Rick for that proceeding. Dr. Sweet believed the case was "[e]xtremely close," but he concluded that Rick met Minnesota's SDP criteria at that time, in part because Rick withdrew from treatment. (Ex. 5 at 27; Hr'g Tr. III at 26, 29.) At the time, Dr. Sweet believed that anyone who dropped out of treatment would be more likely to reoffend. (Hr'g Tr. III at 26–27.) In 2019, after reviewing Dr. Phenix's report, Dr. Sweet concluded that Rick did not meet the SDP criteria when committed because "improved actuarial results" would show Rick's risk of recidivism was "significantly lower than earlier measures." (*Id.* at 30–31; *see* Ex. 6 at 4.)

Dr. Sweet has performed four or five sex-offender evaluations annually for about fifteen years. (Hr'g Tr. III at 16.) As with Dr. Alberg, Dr. Sweet testified that that he had never been involved in a case that resulted in commitment after two court-appointed examiners counseled against commitment, but a retained expert recommended it. (*Id.* at 90–91.)

Hennepin County contends that the R&R erred in finding that Dr. Sweet's hearing testimony was "consistent with his 2019 written statement and . . . quite credible." (R&R

at 15.) Having reviewed the record, the Court finds that Dr. Sweet's testimony aligns with his 2019 statement. The Court also finds Dr. Sweet's testimony credible. Dr. Sweet recanted his earlier opinion that Rick qualified as an SDP in 2004 after reviewing Dr. Phenix's report. (Hr'g Tr. III at 72, 82.) Although Dr. Sweet did not review the 2009 and 2012 Studies before authoring his 2019 statement, he did review them before the habeas hearing and did not change his position. (*Id.* at 70–71, 81–83.) The remaining issues raised by Hennepin County, including that Dr. Sweet was retained by Rick, testified that his 2004 opinion was not false, and believed that Minnesota's commitment statute was overly broad, (Obj. at 5–6), do not sway the Court as to Dr. Sweet's credibility.

  4.   *Dr. Alsdurf*

Dr. Alsdurf interviewed Rick in connection with his criminal proceedings in 1994. (Hr'g Tr. I at 192.) A decade later, Hennepin County retained Dr. Alsdurf in support of Rick's commitment as an SDP. (*Id.*) Dr. Alsdurf concluded that Rick met the SDP criteria. (Ex. 9 at 16.) After reviewing his original report, the commitment trial transcript, the 2009 and 2012 Studies, and the reports by Drs. Phenix, Alberg, and Sweet, Dr. Alsdurf continues to believe that Rick met the SDP criteria in 2004. In in support of his conclusion, Dr. Alsdurf relied on "the presence of [Rick's] sexual deviance, the persistence of his sexual deviance, his age, and the fact that [Dr. Alsdurf] did not see any real evidence of change over a several year period of time." (Hr'g Tr. I at 208; *see id.* at 196, 206 (listing these and other factors such as age and gender as "significant factors" in clinical

override).) He does, however, acknowledge that this was a close case. (Hr'g Tr. at 210; *see id.* at 207 ("[T]his is not a slam-dunk case.").)

According to Hennepin County, the R&R erred in finding Dr. Alsdurf "less credible than Drs. Sweet and Alberg regarding whether Rick met the SDP criteria in 2004." (R&R at 20; *see* Obj. at 7–8.) The R&R found Dr. Alsdurf to be less credible in part because he "was overconfident in his assertions and refused to concede minor points," (R&R at 20), and criticized his own 2004 report, stating he "would write this report differently today" to emphasize Rick's violence. (Hr'g Tr. I at 196.)

Having reviewed the record, the Court agrees that Dr. Alsdurf's testimony about whether Rick met the SDP criteria was less credible than Drs. Alberg and Sweet. Besides the issues above, the Court did not find his testimony persuasive because although Dr. Alsdurf found the 2009 and 2012 Studies "interesting" and "helpful," he did not explain why he did not find them "persuasive in the sense that [they] changed [his] opinion." (Hr'g Tr. I at 194–95.) Dr. Alsdurf also testified that a record of sex-therapy treatment is a "very significant issue," but he did not grapple with the studies indicating that dropping out of treatment has an insignificant effect on future recidivism.[16] (Hr'g Tr. I at 196; *see id.* at 194–97.)

---

[16] Dr. Alsdurf also appears to have weighed other factors more heavily than the trial court and the court-appointed examiners. For example, he noted Rick's history of abuse was "really deviant," "really serious," and "really violent." (Hr'g Tr. I at 197.) As discussed, he also considered the presence and persistence of Rick's sexual deviance, Rick's age, the

5.    *Dr. Hoberman*

As discussed, Dr. Hoberman did not testify at the original commitment trial; he is a forensic psychologist retained by Hennepin County to testify at Rick's habeas hearing. (*See generally* Hr'g Tr. II.) His testimony was limited to assessing the reliability of the 2009 and 2012 Studies. (ECF No. 81 (order limiting Dr. Hoberman's testimony).) The Court finds that Dr. Hoberman is well qualified to testify about sex-offender research and recidivism rates.

The R&R found that Dr. Hoberman's testimony was "credible, [but] was less persuasive . . . because he at times attempted to avoid answering questions directly and gave non-responsive information in a convoluted way." (R&R at 22 (citing Hr'g Tr. II at 82–88).) "Mostly, however, his testimony was not directly germane to the precise legal issues with which this court must grapple." (*Id.*) Hennepin County objects to this finding because it "fails to evaluate his testimony in light of the reliability of the [2009 and 2012] Studies." (Obj. at 8.) As part of its *de novo* review, this Court has considered Dr. Hoberman's testimony—which it finds to be credible, but not more credible than Drs. Alberg and Sweet—in determining that the 2009 and 2012 Studies are reliable for consideration of the actual-innocence gateway exception.

_____

lack of change over several years, and gender. This evidence was presented and considered at the commitment trial, and the court initially ordered outpatient treatment for Rick. (*See generally* Ex. 1.) The Court defers to the commitment court's weight of such evidence. *See* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct").

6.    *Summary*

For the reasons above, the Court overrules the County's objections on reliability and credibility. It also concludes that, based on new reliable evidence, it is more likely than not that no reasonable jurist would have ordered Rick's civil commitment in 2004. Thus, the actual-innocence exception to AEDPA applies, and the Court therefore turns to Rick's due-process claim.

**II.    Due-Process Claim**

Rick's due-process claim is based on the evidence discovered after his commitment that "undermined and discredited the critical risk assessment tools and clinical assumptions" on which the state court based his commitment, rendering that commitment "a fundamental miscarriage of justice." (2d Am. Pet. at 3–4.) To prevail on this claim, Rick must show that "the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Rousan v. Roper*, 436 F.3d 951, 958–59 (8th Cir. 2006) (citation omitted). Hennepin County contends that the R&R erred in concluding that Rick met this standard. (Obj. at 10.)

*Recantations.* Hennepin County objects to the R&R's characterization of the "recantation evidence" of Drs. Alberg and Sweet. (Obj. at 10.) The County asserts that Drs. Alberg and Sweet did not recant all their prior testimony, and that the R&R erred in not considering other testimony. (*Id.* at 10–11.)

The Court agrees that Drs. Sweet and Alberg did not recant their entire prior testimony, and after reviewing the R&R, finds that the R&R concluded similarly. The R&R states that "Drs. Sweet and Alberg have recanted their 2004 opinions that Rick met the criteria to be civilly committed," (R&R at 19), and thus Judge Schultz gave "no consideration to the now-recanted testimony." (*Id.* at 34.) By "now-recanted testimony," the Court understands Judge Schultz to mean Drs. Sweet's and Alberg's opinions that Rick met the SDP criteria. The R&R is based on "all the evidence" and "the entire habeas record," (*id.* at 41, 42), which includes Drs. Alberg's and Sweet's testimony at the habeas hearing. At that hearing, Drs. Alberg and Sweet testified about the various factors each had considered in reaching their original and revised opinions about Rick's qualification as an SDP. (*See* Hr'g Tr. I at 159–65 (Dr. Alberg testifying about Rick's offense pattern and treatment history, among other factors); Hr'g Tr. III at 61–63, 66 (Dr. Sweet testifying about factors contributing to Rick's likelihood to reoffend).)

*The 2009 and 2012 Studies.* Hennepin County also argues that because it disputed the reliability of the evidence presented, the literature relied upon by Rick's experts— presumably, the 2009 and 2012 Studies—are not inherently exculpatory. (Obj. at 11–12.) Courts have denied habeas relief when a petitioner presented evidence that did not repudiate previous evidence, but rather suggested there was debate about its validity within the scientific community. *See, e.g., Feather v. United States*, 18 F.4th 982, 987 (8th Cir. 2021) ("[I]f Feather's new medical and recantation evidence would have been

presented at trial it would have established, at most, conflicting testimony and thus a reasonable juror considering all the evidence, old and new, could still convict Feather." (quotation marks omitted)); *Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016) (denying habeas relief where petitioner "presented literature revealing not so much a repudiation of [a scientific theory], but a vigorous debate about its validity within the scientific community"). Rick presents more than just literature suggesting a debate about the risk of recidivism. *Both* court-appointed examiners recanted their opinions that Rick met the SDP criteria. Although Hennepin County maintains that the totality of the evidence supports a finding that Rick was highly likely to reoffend, these examiners—who were questioned about a multitude of risk factors at the habeas hearing—disagree.

*Minnesota caselaw.* Hennepin County contends that the R&R erred in finding a "reasonable probability that the now-recanted opinions affected the outcome of Rick's commitment trial" because it failed to apply Minnesota caselaw properly. (Obj. at 12 (capitalization omitted).) The County bullet-points (without analysis) the holdings of several cases it contends that the R&R ignored. (*Id.* at 13–14.) A review of those cases shows that none warrants a conclusion different from the one reached by the R&R.

For example, the County argues that the R&R ignored caselaw holding that expert testimony is not a prerequisite to commitment, nor is the state district court bound by an expert opinion. (Obj. at 13); *see In re Civ. Commitment of Miles*, No. A14-0795, 2014 WL 4798954, at *4 (Minn. Ct. App. Sept. 29, 2014) (unpublished) ("Under the commitment

statute, the district court, not the expert, must determine whether the statutory legal standards are met, although the assistance of experts may be required."); *In re Commitment of Luhmann*, No. A07-912, 2007 WL 2417341, at *5 (Minn. Ct. App. Aug. 28, 2007) (affirming commitment despite experts' opinions to the contrary). The Court sees nothing in the R&R indicating that Judge Schultz ignored these directives. Instead, he applied the correct standard, which is based on "a multi-factor analysis" using "the benefit of all the relevant and reliable evidence." *Ince*, 847 N.W.2d at 23; (*see* R&R at 36–37 (listing the factors)).

Similarly, the County's contention that the R&R ignored caselaw in which "[c]ommitment has been upheld where *no* base rate statistics were considered," or suggesting that "[b]ase rate information cannot be solely relied upon in assessing risk," is of no moment: the base rate information is not the sole evidence on which the Court is granting the habeas petition, nor was it the sole evidence considered by the R&R. (Obj. at 13 (citing *In re Pirkl*, 531 N.W.2d 902, 909 (Minn. Ct. App. 1995); *Linehan III*, 557 N.W.2d at 190).) The remaining caselaw cited by the County in this section of objections does not apply to—or change—the Court's analysis.

*Due-process analysis.* Rick's initial commitment proceeding was undeniably a very close case. The state court addressed Rick's withdrawal from treatment and Drs. Alberg's and Sweet's opinions that Rick had a moderate risk of recidivism, and it concluded that Rick's "moderate risk of recidivism combined with not completing sex offender

treatment . . . proved by clear and convincing evidence that there is a likelihood of [Rick] reoffending." (Ex. 1 at 17.) The court also considered Dr. Alsdurf's conclusion that Rick met the criteria of an SDP in part because Rick "had not completed treatment." (*Id.* at 13.) And it considered Dr. Alsdurf's conclusions that Rick had a high likelihood of reoffending, and that he should be committed to the MSOP. (*Id.* at 13.) Based on this evidence, the court in 2004 found that Rick met the criteria for an SDP. (*Id.* at 14.)

Almost twenty years later, Drs. Alberg and Dr. Sweet have recanted their opinions that Rick met the criteria for an SDP at the time of his commitment and now conclude that he did not meet the criteria. In light of this new evidence, the Court agrees with the R&R that "it is very likely the state court would have ascribed considerably less weight to Rick's 'record with respect to sex therapy' at the time of his commitment." (R&R at 38 (citing *In re Linehan*, 518 N.W.2d 609, 611 (Minn. 1994))); *see generally Lewis v. Erickson*, 946 F.2d 1361, 1362 (8th Cir. 1991) ("Recanted testimony . . . is grounds for relief from a conviction when it either bears on a witness's credibility or directly on the defendant's guilt."). Indeed, the Court is hard-pressed to believe that, in such a close case, a reasonable court would reject the testimony of both court-appointed examiners and the DOC's Civil Commitment Review Coordinator that Rick should not be civilly committed, (*see* Ex. 1 at 10), in favor of the testimony of a privately retained expert that he does. It is more likely than not that, considering the new reliable evidence described above, no reasonable jurist would have found by clear and convincing evidence that Rick met the

standard for commitment. Because Rick has shown that the alleged improprieties were so egregious that they fatally infected his commitment proceeding and rendered the proceeding fundamentally unfair, the Court grants his habeas petition.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      Hennepin County's Objection (ECF No. 100) is OVERRULED;

2.      The Report and Recommendation (ECF No. 94) is ACCEPTED;

3.      Rick's Second Amended Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus (ECF No. 45) is GRANTED; and

4.      Respondent is ORDERED to release Rick from detention and confinement in the MSOP program.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: June 21, 2023                          BY THE COURT:

                                             s/Nancy E. Brasel
                                             Nancy E. Brasel
                                             United States District Judge